[S.F. No. 24745. Oct. 21, 1985.]

Conservatorship of the Person of VALERIE N.
MILDRED G., as Conservator, etc., et al., Petitioners and Appellants, v.
VALERIE N., Objector and Respondent.

144

146

COUNSEL

Allen H. Fleishman and Fleishman & Jensen for Petitioners and Appellants.

Frank O. Bell, Jr., and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Paul D. Fogel and Ezra Hendon, Deputy State Public Defenders, for Objector and Respondent.

Eric R. Gelber and Carolyn Schneider as Amici Curiae on behalf of Objector and Respondent.

OPINION

**GRODIN, J.**—Mildred and Eugene G., her mother and stepfather, are co-conservators of the person of their adult developmentally disabled daughter

Valerie.[1] They appeal from a judgment of the probate court denying their petition for authorization to have a tubal ligation (salpingectomy) performed on Valerie. The primary purpose of the proposed operation is habilitation. Any therapeutic benefit would be incidental. The probate court, while agreeing with appellants that the procedure was medically safe and would enhance the quality of Valerie's life, concluded that it lacked jurisdiction to grant the petition.

We are asked to determine whether section 2356, subdivision (d),[2] upon which the trial court relied, precludes the sterilization of a severely retarded conservatee[3] in all circumstances and, if so, whether application of that

---

[1]Welfare and Institutions Code section 4512 defines "[d]evelopmental disability" as "a disability which originates before an individual attains 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature." (See also Prob. Code, § 1420.)

All future statutory references, unless otherwise indicated, are to the Probate Code.

[2]Section 2356, subdivision (d), provides: "No ward or conservatee may be sterilized under the provisions of this division."

[3]One percent of the general population meets the criteria of the American Psychiatric Association for mental retardation. Of these, 1 percent are classified as profoundly retarded with an IQ below 20, and 7 percent are classified as severely retarded with an IQ of 20 to 34. It is possible that persons classified as moderately retarded may be adjudged incompetent to consent to any medical treatment. This group, whose IQ is from 35 to 49, make up 12 percent of the mentally retarded. This classification includes persons who "during the pre-school period can talk or learn to communicate, but they have only poor awareness of social conventions. They may profit from vocational training and can take care of themselves with moderate supervision. During the school-age period, they can profit from training in social and occupational skills, but are unlikely to progress beyond the second-grade level in academic subjects. They may learn to travel alone in familiar places. During their adult years they may be able to contribute to their own support by performing unskilled or semiskilled work under close supervision in sheltered workshops. They need supervision and guidance when under mild social or economic stress."

Those who are severely retarded evidence "poor motor development and minimal speech" during the preschool period and "develop little or no communicative speech. During the school-age period, they may learn to talk and can be trained in elementary hygiene skills. They are generally unable to profit from vocational training. During their adult years they may be able to perform simple work tasks under close supervision."

The profoundly mentally retarded "display minimal capacity for sensorimotor functioning. A highly structured environment, with constant aid and supervision, is required. During the school-age period, some further motor development may occur and the children may respond to minimal or limited training in self-care. Some speech and further motor development may take place during the adult years, and very limited self-care may be possible, in a highly structured environment with constant aid and supervision." (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) pp. 38-40.)

Biological abnormalities such as Down's Syndrome and phenylketonuria are believed to be the cause of 25 percent of the incidence of retardation, and cause moderate to profound retardation. (*Id.*, at p. 38.) No statistical breakdown of the incidence of retardation by sex is included in this volume.

prohibition to Valerie denies her the benefits of state and/or federal constitutional guarantees of privacy, equal protection, and due process.

We shall conclude that the Legislature, in enacting subdivision (d) of section 2356, while contemporaneously repealing Welfare and Institutions Code section 7254, intended to discontinue the longstanding, but discredited, practice of eugenic sterilization,[4] and to deny guardians and conservators authorization to have the procedure performed on their wards and conservatees. The judgment must be affirmed because the record does not support a conclusion that sterilization is necessary to Valerie's habilitation and does not support the trial court's implicit conclusion that less intrusive means by which to avoid conception are unavailable to Valerie. We shall also conclude, however, that the present statutory scheme denies incompetent developmentally disabled persons rights which are accorded all other persons in violation of state and federal constitutional guarantees of privacy. Our affirmance of the judgment therefore is without prejudice to a renewed petition and hearing at which the requisite showing may be made.

## I.

Valerie was born on July 13, 1955, apparently a victim of Downs Syndrome as a result of which she is severely retarded. Her IQ is estimated to be 30. She is now 29 years old. She lives with her mother and stepfather. Although she has no comprehension of the nature of these proceedings, she has expressed her wish to continue to have her parents care for her. Her parents' long range plan for Valerie is that she will move to a residential home should they become mentally or physically unable to care for her. She has received therapy and training for behavior modification which was not successful in eliminating her aggressive sexual advances toward men. Her parents are attempting to prepare her for the time when they can no longer care for her, and to broaden her social activities as an aspect of this preparation. They have concluded that other methods of birth control are inadequate in Valerie's case.

On September 5, 1980, appellants filed their petition to be named conservators of Valerie's person in the Santa Clara County Superior Court pursuant to section 1820. In the same petition they sought the additional power to authorize "a Salpingectomy or any other operation that will permanently sterilize" Valerie. The petition was supported by the declaration

---

[4]"Eugenical sterilization" was an early enthusiastic application of Mendelian genetics to what were then perceived to be hereditary mental and physical defects. (See *Sterilization and Mental Retardation* (1965) 51 A.B.A. J. 1059; Robitscher, The Powers of Psychiatry (1980) pp. 266-275.)

of Valerie's personal physician who stated that the tubal ligation procedure is "advisable and medically appropriate."

On September 25, 1980, after review of a court investigator's report which stated that Valerie had no comprehension of the proceedings, could not complete an affidavit of voter registration, and gave no pertinent response when asked if she objected to being disqualified from voting, the probate court granted the petition insofar as it sought appointment of appellants as coconservators. The court continued the hearing on the request for additional powers, however, and appointed counsel to represent Valerie.[5]

On December 10, 1980, when the hearing resumed, appellants submitted a declaration by a physician who had treated Valerie from the time she was 10 years old. He stated that in his opinion a tubal litigation procedure was "advisable and medically appropriate in that a potential pregnancy would cause psychiatric harm to VALERIE." A second declaration, this by a licensed marriage, family and child counselor having a masters degree in developmental psychology, was also submitted. This declarant had worked with Valerie on a weekly basis for a year during 1977-1978. She believed that a tubal ligation was "an appropriate means of guarding against pregnancy," and had observed that Valerie acted "affectionately" toward adult men and made "inappropriate" sexual advances toward them. This declarant was of the opinion that because Valerie's parents had found it necessary to be overly restrictive in order to avoid a possible pregnancy which would have "severe psychologically damaging consequences" to Valerie, close monitoring had severely hampered Valerie's ability to form social relationships. She also believed that the level of Valerie's retardation meant that no alternative birth control methods were available that would ensure against pregnancy.

Valerie's mother testified that Valerie had not been sexually active, apart from masturbation, because she had been closely supervised. She was aggressive and affectionate toward boys. On the street she approached men, hugged and kissed them, climbed on them, and wanted to sit on their laps. Valerie had been given birth control pills in her early teens, but she rejected them and became ill. Her doctor then recommended the tubal ligation. Valerie was unable to apply other methods of birth control such as a diaphragm, and would not cooperate in a pelvic examination for an intrauterine device which the witness believed was unsafe in any event.

---

[5]See sections 1823, subdivision (b), and 2357, subdivision (d). The appointment has been continued in this court.

No evidence was offered by counsel representing Valerie, although he did argue that less drastic alternatives to sterilization should be used, and also questioned the jurisdiction of the probate court to authorize the surgery. It was conceded that the court had the power to authorize an abortion should Valerie become pregnant.[6]

No evidence was offered to establish that Valerie is capable of conceiving, and other than the opinions of her mother and the family counselor no evidence was offered to establish that alternative less intrusive methods of birth control are unavailable.

The trial judge then denied the request for additional powers, explaining he believed both that sterilization was in order and that subdivision (d) of section 2356 was unconstitutional, but was obliged to follow *Guardianship of Tulley* (1978) 83 Cal.App.3d 698 [146 Cal.Rptr. 266], which had held that the probate court lacks jurisdiction to authorize the sterilization of a conservatee.

■ The parties agree that section 2356 bars nontherapeutic sterilization of conservatees. Because that section provides that the procedure may not be authorized "under the provisions of this division," however, we invited additional briefing addressed to whether the Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, § 4500 et seq.) afforded an alternative source of authority. The parties argue that it does not. We conclude that the history of section 2356 supports the parties.

II.

*Statutory Development*

A. *Involuntary Sterilization in California.*

In 1909, California enacted this state's first statute permitting sterilization of developmentally disabled individuals. That authority extended only to

---

[6]Counsel for Valerie has since asked this court to take judicial notice (Evid. Code, §§ 459, 452, subd. (d)), of a memorandum of points and authorities filed in another matter then pending in the superior court by the North Bay Regional Center. In that document the center argued that there is no California statutory authority which sanctions either sterilization or abortion of nonconsenting conservatees. The authority to authorize an abortion is not an issue in the instant case, and while the request to take judicial notice has been granted, it is doubtful that the views of a single regional center are entitled to consideration as reflecting an administrative construction of the relevant statutes. (Cf. *Nipper* v. *California Auto. Assigned Risk Plan* (1977) 19 Cal.3d 35, 45 [136 Cal.Rptr. 854, 560 P.2d 743].)

Although invited to do so, neither the Attorney General nor the responsible statewide agency, the Department of Developmental Services, has sought to intervene or file a brief amicus curiae addressing the statutory and constitutional questions presented.

persons committed to state institutions or prisons, and provided: "Whenever in the opinion of the medical superintendent of any state hospital, or the superintendent of the California Home for the Care and Training of Feeble-Minded Children, or of the resident physician in any state prison, it would be beneficial and conducive to the benefit of the physical, mental or moral condition of any inmate of said state hospital, home, or state prison, to be asexualized, then such superintendent or resident physician shall call in consultation the general superintendent of state hospitals and the secretary of the state board of health, and they shall jointly examine into all of the particulars of the case with the said superintendent or resident physician, and if in their opinion, or in the opinion of any two of them, asexualization will be beneficial to such inmate, patient, or convict, they may perform the same; . . ." (Stats. 1909, ch. 720, § 1, pp. 1093-1094.)

That law was repealed in 1913, and replaced with authority to "asexualize" committed mental patients and developmentally disabled persons prior to their release from state institutions, and developmentally disabled minor and adult patients in state hospitals.[7] In 1917 section 1 of the statute was amended to make it applicable to developmentally disabled adults. It then provided that prior to discharge a person "who is afflicted with mental disease which may have been inherited and is likely to be transmitted to descendants, the various grades of feeble-mindedness, those suffering from perversion or marked departures from normal mentality or from disease of a syphilitic nature," might be asexualized. (Stats. 1917, ch. 489, § 1, p. 571.) No hearing procedure was provided and no judicial approval was required under any of these statutes.

Twenty-two states enacted similar legislation and, as a "pioneer" in the field, California performed the greatest number of sterilization operations.

---

[7]That part of the 1909 law which authorized this procedure for the "benefit" of the person was restricted to prisoners in specified categories. As to other persons subject to the law, the statute provided:

"Section 1. Before any person who has been lawfully committed to any state hospital for the insane, or who has been an inmate of the Sonoma State Home, and who is afflicted with hereditary insanity or incurable chronic mania or dementia shall be released or discharged therefrom, the state commission in lunacy may in its discretion, after a careful investigation of all the circumstances of the case, cause such person to be asexualized, and such asexualization whether with or without the consent of the patient shall be lawful and shall not render the said commission, its members or any person participating in the operation liable either civilly or criminally.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Section 3. Any idiot if a minor, may be asexualized by or under the direction of the medical superintendent of any state hospital, with the written consent of his or her parent or guardian, and if an adult, then with the written consent of his or her lawfully appointed guardian, and upon the written request of the parent or guardian of any such idiot or fool, the superintendent of any state hospital shall perform such operation or cause the same to be performed without charge therefor." (Stats. 1913, ch. 363, pp. 775-776.)

One of the first legal commentaries on the practice noted that "[b]etween 1907 and 1921 California sterilized 2,558 of the 3,233 total for all United States in that period." (Comment, *Constitutional Law—. . . Sterilization of Defectives* (1927) 1 So.Cal.L.Rev. 73, 74, fn. 5.) The same author quoting from an article by Popenoe, *Eugenic Sterilization in California,* published in the Journal of Social Hygiene in May 1927, reported that " '[t]he total number of operations performed to date is more than 5,000, which is four times as many as have been performed for eugenic reasons, in governmental institutions, in all the rest of the world together, so far as known.' " (*Id.,* at p. 74, fn. 5.) Although challenged on a variety of constitutional grounds, principally denial of due process and equal protection, most of these statutes were upheld, if adequate procedural safeguards, including a hearing for the patient, were afforded.[8]

Codified as section 6624 of the Welfare and Institutions Code in 1937 (Stats. 1937, ch. 369, § 6624, p. 1155), the substantive aspects of the California law remained essentially unchanged over the next 40 years.[9] In 1951

---

[8]For a more detailed description of the various types of state laws and the manner in which they fared in the courts see 1 So.Cal.L.Rev., *supra,* at page 73; and Comment, *Constitutional Law: Insane and Defective Persons: Sterilization of Defectives* (1929) 17 Cal.L.Rev. 270.

The prevalent attitude, reflective of the limited knowledge of the nature of developmental disabilities then available, appeared in the oft-quoted opinion of Justice Holmes in *Buck* v. *Bell* (1927) 274 U.S. 200 [71 L.Ed. 1000, 47 S.Ct. 584], upholding a Virginia statute that permitted sterilization of persons believed to suffer from hereditary conditions when the welfare of the patient and society would benefit. After noting the declaration of the Legislature that the Commonwealth was supporting patients in hospitals who might be discharged and become self-supporting if unable to procreate, and that heredity was important in the transmission of insanity and imbecility, he upheld the law with the following reasoning: "In view of the general declarations of the legislature and the specific findings of the Court, obviously we cannot say as a matter of law that the grounds do not exist, and if they exist they justify the result. We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Jacobson* v. *Massachusetts,* 197 U.S. 11. Three generations of imbeciles are enough." (274 U.S. at p. 207 [71 L.Ed. at p. 1002].)

In *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 27 [49 L.Ed. 643, 650, 25 S.Ct. 358], the court had upheld a compulsory vaccination law enacted to halt the spread of smallpox, concluding that the statute was one within the police power of the Commonwealth, declaring that "[u]pon the principle of self-defense, or paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."

[9]Welfare and Institutions Code section 6624 provided: "The provisions of this section apply to any person who has been lawfully committed to any State hospital, and who is afflicted with, or suffers from, any of the following conditions:

"(a) Mental disease which may have been inherited and is likely to be transmitted to

significant procedural protections were added, the nomenclature of eligible patients was changed to substitute "mental deficiency" for "feeble-mindedness," and subdivisions (c) and (d) were combined into a single category of persons exhibiting "marked departures from normal mentality."[10] After being renumbered as Welfare and Institutions Code section 7254 in 1967, this authority for nonconsensual sterilization was finally repealed in 1979,[11] operative January 1, 1980.[12]

---

descendants.

"(b) Feeble-mindedness, in any of its various grades.

"(c) Perversion or marked departures from normal mentality.

"(d) Disease of a syphilitic nature.

"Before any such person is released or discharged from a State hospital, the State Department of Institutions may, in its discretion, cause such person to be sterilized. Such a sterilization, whether performed with or without the consent of the patient, shall be lawful and shall not render the department, its officers or employees, or any person participating in the operation liable either civilly or criminally."

[10]Statutes 1951, chapter 552, section 1, page 1706.

[11]Statutes 1979, chapter 552, section 1, page 1762; Statutes 1979, chapter 730, section 156.5, page 2540.

[12]At the time of its repeal, Welfare and Institutions Code section 7254 authorized sterilization of patients in state institutions, afforded opportunity for judicial review, and reflected primarily a eugenic-based policy. As amended in 1977 (Stats. 1977, ch. 1252, § 658, p. 4609), the section read: "The provisions of this section apply to any person who has been lawfully committed or admitted to any state hospital for the mentally disordered or mentally retarded and who is afflicted with, or suffers from, any of the following conditions:

"(a) Mental disease which may have been inherited and is likely to be transmitted to descendants.

"(b) Mental retardation, in any of its various grades.

"(c) Marked departures from normal mentality.

"The State Department of Mental Health, with respect to a patient or resident in a state hospital or home under its jurisdiction, and the State Department of Developmental Services with respect to a patient or resident in a state hospital or home under its jurisdiction, upon compliance with the provisions of this section, may cause any such person to be sterilized by the operation of vasectomy upon the patient if a male and of salpingectomy if a female or any other operation or treatment that will permanently sterilize but not unsex the patient. When the superintendent of the state hospital or state home is of the opinion that a patient who is afflicted with or suffering from any of the conditions specified in this section should be sterilized, he shall certify such opinion to the director of the department having jurisdiction over the hospital or home and shall at the same time give written notice of such certification to the patient and to his known parents, spouse, adult children, or guardian, if any, by registered mail to their last known address. If the patient has no known relatives or guardian, such notice shall be given to the person who petitioned for the patient's commitment. Such notice shall further state that written objection or written consent to the proposed sterilization, should be filed with the director of the department having jurisdiction over the hospital or home at his office in Sacramento within 30 days by the patient, spouse, next of kin or guardian.

"When a written consent is filed, or if no objection is filed within the 30 days, the director of the department having jurisdiction over the hospital or home, if satisfied that the sterilization will not unduly endanger the patient's health and that it is a proper case for sterilization, may authorize the superintendent to proceed with the sterilization of the patient. The director may cause such examination of the patient and other inquiry to be made as he deems advisable before issuing the authorization to the superintendent.

"If a written objection is filed within 30 days by the patient, his spouse, next of kin, or

B. *Revision of the Guardianship-Conservatorship Law.*

During the 40-year period during which involuntary sterilization was permissible significant advances occurred both in understanding of the causes of mental retardation, and in public awareness that many developmentally disabled persons lead self-sufficient, fulfilling lives, and become loving, competent, and caring marriage partners and parents.[13] In 1978 the California Law Revision Commission submitted to the Legislature a draft of a new guardianship-conservatorship law which expressly denied the probate court jurisdiction to grant conservators the power to cause their wards and conservatees to be sterilized.[14] Affording safeguards, rather than barring sterilization, was the basis for the proposal, however, and sterilization would have been available under this proposal if the conservatee were admitted to a state hospital. As proposed, section 2356, subdivision (d), read: "A ward or conservatee may be sterilized only as provided in Section 7254 of the Welfare and Institutions Code." The comment accompanying the section explained: "Subdivisions (b)-(d) are new and make clear that the provisions of other codes relating to highly intrusive forms of medical treatment are the only provisions under which such treatment may be authorized for a ward or conservatee, *thus assuring that the procedural safeguards contained in those provisions will be applied.* Subdivision (d) is consistent with Guardianship of Tulley, 83 Cal.App.3d 698, 146 Cal.Rptr. 266 (1978)

---

guardian, and in those cases where the patient has no known relatives or guardian, the proposed sterilization shall not be authorized or performed until the director of the department having jurisdiction over the hospital or home has determined the matter. He shall make full inquiry into the case, and may hold a hearing at the institution at which hearing the patient shall be present, and the objecting party and others interested on behalf of the patient may be heard. If the decision of the director is that the patient shall not be sterilized, he shall so order and notify the superintendent, the patient and the objecting party. If the decision of the director is that the patient should be sterilized, he shall send notice of such decision to the patient, his known parents, spouse, adult children, and guardian, if any, and the objecting party, by registered mail to their last known address. Such notice shall further state that any such party has the right within 30 days to petition the superior court of the county in which the institution is situated or of the county of the patient's residence for a review of the decision.

"If such petition is filed in court within 30 days, and a true copy thereof is served upon the director of the department having jurisdiction over the hospital or home, the patient shall not be sterilized unless and until the court, after hearing, issues an order authorizing the sterilization of the patient in accordance with the provisions of this section. If such petition is not filed in court within 30 days, the director may authorize the superintendent to proceed with such sterilization. The sterilization of a patient in accordance with the provisions of this section, whether performed with or without the consent of the patient, shall be lawful and shall not render the department, its officers or employees, or any persons participating in the operation liable either civilly or criminally."

[13]See Katzman, *Parental Rights of the Mentally Retarded* (1981) 16 Colum. J.L. & Soc. Probs. 521.

[14]The commission was asked to study revision of the Guardianship-Conservatorship Law by Senate Concurrent Resolution No. 6 in 1972. (Stats. 1972 (Reg. Sess.) res. ch. 27, p. 3227.)

and Guardianship of Kemp, 43 Cal.App.3d 758, 118 Cal.Rptr. 64 (1974)." (14 Cal. Law Revision Com. Rep. (1978) p. 725, italics added.)

Before enacting the new Guardianship-Conservatorship Law recommended by the Law Revision Commission, however, the Legislature repealed Welfare and Institutions Code section 7254. That section, therefore, no longer afforded authorization for the sterilization of mentally retarded wards or conservatees, even if they were admitted to state institutions and were afforded the procedural protections contemplated by the commission. The intent of the Legislature is clear. Neither the probate court, nor state hospital personnel were to retain authority to permit a nontherapeutic sterilization of a conservatee who is unable to personally consent to the procedure.[15]

C. *The Lanterman Developmental Disabilities Services Act.*

In 1977, the Legislature, possibly concerned about the rising tide of criticism of compulsory sterilization,[16] and by then fully aware of the importance of providing services to developmentally disabled persons to assist them in remaining in noninstitutional settings, enacted the Lanterman Developmental Disabilities Services Act (LDDSA). (Welf. & Inst. Code, § 4500 et seq.)

The LDDSA reflected a change in legislative attitude toward the mentally retarded, a change which found impetus in the recommendation of the Study

---

[15]Section 1880 authorizes a judicial determination of inability to give informed consent, in which case the conservator is empowered to consent to medical treatment, except as provided in section 2355: "If the court determines that there is no form of medical treatment for which the conservatee has the capacity to give an informed consent, the court shall (1) adjudge that the conservatee lacks the capacity to give informed consent for medical treatment and (2) by order give the conservator of the person the powers specified in Section 2355. If an order is made under this section, the letters of conservatorship shall include a statement that the conservator has the powers specified in Section 2355."

Section 2355 provides: "(a) If the conservatee has been adjudicated to lack the capacity to give informed consent for medical treatment, the conservator has the exclusive authority to give consent for such medical treatment to be performed on the conservatee as the conservator in good faith based on medical advice determines to be necessary and the conservator may require the conservatee to receive such medical treatment, whether or not the conservatee objects. In any such case, the consent of the conservator alone is sufficient and no person is liable because the medical treatment is performed upon the conservatee without the conservatee's consent. [¶] (b) If prior to the establishment of the conservatorship the conservatee was an adherent of a religion whose tenets and practices call for reliance on prayer alone for healing, the treatment required by the conservator under the provisions of this section shall be by an accredited practitioner of that religion."

[16]For an overview of the course of changing knowledge and attitude, and introduction to the recent literature, see Note, *Procreation: A Choice for the Mentally Retarded* (1984) 23 Washburn L.J. 359. See also *Maxon v. Superior Court* (1982) 135 Cal.App.3d 626 [185 Cal.Rptr. 516]; *Matter of A.W.* (Colo. 1981) 637 P.2d 366, 368; Ferster, *Eliminating the Unfit—Is Sterilization the Answer?* (1966) 27 Ohio St. L.J. 591, 602.

Commission on Mental Retardation which reported to the Governor and Legislature in January 1965. The commission proposed a variety of state supported services for the retarded, including rehabilitation and educational services aimed at vocational training, and the creation of regional centers as a means by which services would be brought to the families of mentally retarded children to assist them in making "an appropriate lifetime plan." (See Study Com. on Mental Retardation, The Undeveloped Resource, A Plan for the Mentally Retarded in California (1965) p. 46.)

The centers were to make community services accessible, provide special services where necessary, and provide home services for the "mildly retarded [who] may be enabled to live at home if they receive occasional visits from a public health nurse or homemaker . . . ." (*Id.*, at p. 53.)[17]

The report also recommended that residential facilities be provided for mentally retarded persons who could not live independently, but were not in need of the services of a state hospital which then was the only public institution for the mentally retarded in California. (*Id.*, at pp. 70-71.) These facilities "would reflect a concern with these people as individuals and would make it possible for them to enter into community life insofar as they are able. It would also facilitate normal family and neighborly relationships, which are harder to achieve in a large institution." (*Id.*, at p. 74.) The study commission recommended further study of a proposal that sterilization be made available when necessary to achieve this purpose.

The Legislature undertook to implement the proposed reforms in a series of steps which culminated in the LDDSA. The California Mental Retardation Services Act of 1969 was enacted to restructure the provision of services to the mentally retarded which had been the responsibility of eight state agencies and numerous local programs. That act, former division 25 of the Health and Safety Code (commencing at former § 38000; Stats. 1969, ch. 1594, § 1, p. 3234) provided for regional centers to be operated by private, nonprofit community and local agencies to provide services to the mentally retarded and their families. It prohibited judicial commitment of persons who were not a danger to themselves or others to state hospitals on referral by a regional center, and authorized the regional centers to purchase out-of-hospital care for the mentally retarded.[18]

---

[17]The evolution of the regional center concept in California is described by three former staff members of the California State Council on Developmental Disabilities in their article: Myers et al., *Legislative Evolution of a Statewide Service System: California's Regional Centers for Developmentally Disabled Persons* (1983) 14 Rutgers L.J. 653.

[18]The 1969 act was adopted after the Assembly Office of Research and the staff of the Assembly Ways and Means Committee, pursuant to Assemblyman Lanterman's request and House Resolution No. 372 (3 Assem. J. (1968 Reg. Sess.) p. 4548), had submitted "A

The final impetus for the LDDSA occurred in 1975 when federal legislation expanded the type of services to be afforded the developmentally disabled by states receiving federal funding for their programs. In that year Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act (DDA) (Pub.L. No. 94-103), included in which was recognition of a right to "treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty." (42 U.S.C. § 6010(1) & (2).)[19]

When the LDDSA was enacted in 1977 sterilization continued to be available under Welfare and Institutions Code section 7254, the repeal of which did not become effective until January 1, 1980. (Stats. 1979, ch. 552, § 1, p. 1762; Stats. 1979, ch. 730, § 156.5, p. 2540.) Accordingly, the LDDSA contained no provision by which sterilization of a conservatee could be

---

Proposal to Reorganize California's Fragmented System of Services for the Mentally Retarded" to the Assembly Ways and Means Committee. That report made no mention of the recommended study of the state's experience with sterilization, and the procedure continued to be available to mentally retarded persons only if they were first committed to a state hospital.

[19]No California statute or regulation (Cal. Admin. Code, tit. 17, § 50501) other than Welfare and Institutions Code section 19352 presently defines "habilitation." In the context of services to be provided by the Department of Rehabilitation the term is defined as "those community-based services purchased or provided for adults with developmental disabilities to prepare them for competitive employment, to prepare and maintain them at their highest level of vocational functioning, or to prepare them for referral to vocational rehabilitation services." (§ 19352.) Although the Legislature declared that these services were to be provided "in order to guarantee the rights stated in Section 4502" (§ 19350), it is manifest from the context in which the term is used in Welfare and Institutions Code sections 4502, 4512, subdivision (b) ("social, personal, physical, or economic habilitation") (former § 19350 et seq.), and 4670, that "habilitation" comprehends services designed to maximize the human potential for the developmentally disabled even though he or she may never be employable.

The word is used repeatedly in the federal DDA and implementing regulations (see, e.g., 45 C.F.R. §§ 1386.4, 1386.30), but is not defined there. In *Pennhurst State School* v. *Halderman* (1981) 451 U.S. 1, 7, footnote 2 [67 L.Ed.2d 694, 701, 101 S.Ct. 1531], the court paraphrased the explanation of the district court explaining: "There is a technical difference between 'treatment,' which applies to curable mental illness, and 'habilitation,' which consists of education and training for those, such as the mentally retarded, who are not ill." The district court's more comprehensive definition explains: " 'Habilitation' is the term of art used to refer to that education, training and care required by retarded individuals to reach their maximum development." (*Halderman* v. *Pennhurst State School & Hospital* (E.D.Pa. 1977) 446 F.Supp. 1295, 1298, affd. in part & revd. in part *Halderman* v. *Pennhurst State Sch. & Hospital* (3d Cir. 1979) 612 F.2d 84, revd. in part *Pennhurst State School* v. *Halderman* (1981) 451 U.S. 1 [67 L.Ed.2d 694, 101 S.Ct. 1531].)

Although these courts note that the concept of habilitation differs from treatment, they and other courts use the terms interchangeably. (See, e.g., *Petition of Ackerman* (Ind. App. 1980) 409 N.E.2d 1211, 1213, fn. 1.) Treatment, education, and training are underinclusive as used to describe the continuing process of habilitation during which, in addition to education, counseling, equipment, supervision, assistance with daily living, and other services are provided to enable the developmentally disabled person to function at his optimum level.

included among the services provided by the regional centers to nonconsenting clients.

Under the LDDSA, regional centers contract with the Department of Developmental Services to seek out and assist developmentally disabled persons within the service area for which they are responsible.[20] Among the services available to persons within a regional center's service area are "preventive services" needed by persons identified as being at risk of parenting a developmentally disabled infant. (Welf. & Inst. Code, § 4644.) The "preventive services" to be provided for such clients may include sterilization of consenting adults.[21] If so, however, the section would authorize sterilization only on request of a client, and only for the purpose of avoiding a high risk of parenting a developmentally disabled infant. Although Valerie might qualify,[22] she is incapable of requesting or consenting to that procedure, and the LDDSA includes no provision for request or consent by a conservator.

---

[20]By 1983 the state had achieved its goal of establishing a network of regional centers adequate to serve residents throughout the state. From the two centers serving 471 retarded clients at the outset of the program, the system has evolved into 21 regional centers serving 65,000 clients in active caseloads. The expanded definition of developmental disability has extended those services to persons with cerebral palsy, epilepsy, autism, and related conditions, as well as to the mentally retarded. (See Myers et al., *supra,* 14 Rutgers L.J. at p. 665.) (See, *ante,* fn. 17.)

[21]Welfare and Institutions Code section 4644 provides: "(a) In addition to any person eligible for initial intake or assessment services, regional centers may cause to be provided preventive services to any potential parent requesting these services. . . . It is the intent of the Legislature that preventive services shall be given equal priority with all other basic regional center services. These services shall, inasmuch as feasible, be provided by appropriate generic agencies, including, but not limited to, county departments of health, perinatal centers, and genetic centers. The department shall implement operating procedures to ensure that prevention activities are funded from regional center purchase of service funds only when funding for these services is unavailable from local generic agencies. In no case, shall regional center funds be used to supplant funds budgeted by any agency which has a responsibility to provide prevention services to the general public.

"(b) For purposes of this section, 'generic agency' means any agency which has a legal responsibility to serve all members of the general public and which is receiving public funds for providing such services."

[22]Were she able to give consent, Valerie might qualify for these services as a person having a high risk of parenting a developmentally disabled infant within the meaning of the statute. It has been suggested that a woman whose retardation is caused by the genetic defect manifested by Downs Syndrome has a 50 percent chance of bearing a child having the same condition, and if the father is similarly afflicted the probability nears 100 percent. (See *Matter of C.D.M.* (Alaska 1981) 627 P.2d 607, 608.)

Downs Syndrome occurs in persons who have 47 chromosomes, rather than 46. The extra chromosome is a third No. 21 chromosome rather than the normal pair, from which the disorder takes the scientific name "trisomy." (See *In re Grady* (1981) 85 N.J. 235 [426 A.2d 467, 469, fn. 1], and sources cited.) The record in this case reflects no evidence of the cause of Valerie's retardation and, as noted above, no evidence that she is capable of conceiving.

The regional center must also undertake activities necessary to the achievement of the goals of the individual program plan (IPP) it devises for a client. Among these activities is "[p]rogram coordination which may include securing, through purchase or referral, services specified in the person's plan, coordination of service programs, information collection and dissemination, and measurement of progress toward objectives contained in the person's plan." (Welf. & Inst. Code, § 4648, subd. (a).)

The Legislature has given high priority to the provisions of services necessary to enable children to remain in the home of their parents when this is a preferred objective in an IPP. (Welf. & Inst. Code, § 4685.)

The regional center is also authorized to purchase out-of-home care for developmentally disabled clients in licensed community care facilities, or assist in placement and follow-along services for those individuals who cannot remain in the home of a parent or relative. (Welf. & Inst. Code, § 4648, subd. (b).) It is the intent of the LDDSA that services for such clients continue to provide "an unbroken chain of experience, maximum personal growth and liberty," under "conditions of everyday life which are as close as possible to the norms and patterns of the mainstream of society." (Welf. & Inst. Code, § 4830; see also § 4501.)

The legislative intent that developmentally disabled persons be assisted in achieving their maximum developmental potential is express in the findings set forth in Welfare and Institutions Code section 4501 which explain that coordinated services are required to "insure that no gaps occur in communication or provision of services" and that "[s]ervices should be planned and provided as part of a continuum . . . sufficiently complete to meet the needs of each person with developmental disabilities, regardless of age or degree of handicap, and at each stage of life." It is also express in the legislative statement of the rights of the developmentally disabled to "[t]reatment and habilitation services [to] foster the developmental potential of the person . . . provided with the least restrictive conditions necessary to achieve the purposes of treatment" (Welf. & Inst. Code, § 4502, subd. (a)) and in the right to "social interaction and participation in community activities . . . to physical exercise and recreational opportunities," and to be "free from . . . isolation." (Welf. & Inst. Code, § 4502, subds. (f)-(h).) Finally, it appears in the breadth of services which the LDDSA authorizes.[23]

---

[23]In addition to those already noted, subdivision (b) of Welfare and Institutions Code section 4512 itemizes a variety of services within its definition of that term: "'Services for persons with developmental disabilities' means specialized services or special adaptations of generic services directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with

■■■■■■■■■■■■■■■■

Nonetheless, neither the provision for preventive services nor any other provision of the LDDSA authorizes sterilization of nonconsenting persons even when necessary to achieve these goals, and the Legislature took no action to amend the LDDSA either in conjunction with the enactment of section 2356, subdivision (d) or once the repeal of Welfare and Institutions Code section 7254 became effective. We conclude therefore that this legislation does not presently afford a mechanism by which sterilization of Valerie may be authorized.

### III.

### *Constitutional Rights of the Developmentally Disabled*

■■■ Our conclusion regarding the present legislative scheme requires that we confront appellants' contention that the scheme is unconstitutional. Both appellants and counsel for Valerie pose the constitutional question in terms of the right of procreative choice. Appellants argue that subdivision (d) of section 2356 deprives Valerie of that right by precluding the only means of contraception realistically available to her, while counsel for Valerie contends that the legislation furthers that right by protecting her against sterilization forced upon her by the will of others. The sad but irrefragable truth, however, is that Valerie is not now nor will she ever be competent to choose between bearing or not bearing children, or among methods of contraception. The question is whether she has a constitutional right to have these decisions made for her, in this case by her parents as conservators, in order to protect her interests in living the fullest and most rewarding life of which she is capable. At present her conservators may, on Valerie's behalf, elect that she not bear or rear children. As means of avoiding the severe psychological harm which assertedly would result from pregnancy, they may choose abortion should she become pregnant; they may arrange for any child Valerie might bear to be removed from her custody; and they may impose on her other methods of contraception, including isolation from members of the opposite sex. They are precluded from making, and Valerie from obtaining the advantage of, the one choice that may be best for her, and which is available to all women competent to choose—contraception through sterilization. We conclude that the present legislative scheme, which absolutely precludes the sterilization option, impermissibly deprives developmentally disabled persons of privacy and liberty interests protected

such a disability, and includes, but is not limited to, diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, physical, occupational, and speech therapy, training, education, sheltered employment, mental health services, recreation, counseling of the individual with such disability and of his family, protective and other social and sociolegal services, information and referral services, follow-along services, and transportation services necessary to assure delivery of services to persons with developmental disabilities.''

by the Fourteenth Amendment to the United States Constitution, and article I, section 1 of the California Constitution.

■ The right to marriage and procreation are now recognized as fundamental, constitutionally protected interests. (*Loving* v. *Virginia* (1967) 388 U.S. 1, 12 [18 L.Ed.2d 1010, 1018, 87 S.Ct. 1817]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; *Perez* v. *Sharp* (1948) 32 Cal.2d 711, 714 [198 P.2d 17]; *People* v. *Pointer* (1984) 151 Cal.App.3d 1128, 1139 [199 Cal.Rptr. 357].) So too, is the right of a woman to choose not to bear children, and to implement that choice by use of contraceptive devices or medication, and, subject to reasonable restrictions, to terminate a pregnancy. These rights are aspects of the right of privacy which exists within the penumbra of the First Amendment to the United States Constitution (*Roe* v. *Wade* (1973) 410 U.S. 113, 154 [35 L.Ed.2d 147, 177, 93 S.Ct. 705]; *Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515, 85 S.Ct. 1678]), and is express in section 1 of article I of the California Constitution which includes among the inalienable rights possessed by all persons in this state, that of "privacy." (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 262 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; see also *People* v. *Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194]; *Carey* v. *Population Services International* (1977) 431 U.S. 678 [52 L.Ed.2d 675, 97 S.Ct. 2010]; *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831].) They are also within the concept of liberty protected against arbitrary restrictions by the Fourteenth Amendment.

Although the Supreme Court has not considered the precise question of the right to contraception in the context of an assertion that the right includes sterilization, that sterilization is encompassed within the right to privacy has been acknowledged in this state. (*Jessin* v. *County of Shasta* (1969) 274 Cal.App.2d 737, 748 [79 Cal.Rptr. 359, 35 A.L.R.3d 1433].) Since *Jessin* was decided this court has affirmed the constitutional stature of the right of women to exercise procreative choice "as they see fit." (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, 263.)

■ In its enactment of section 2356, subdivision (d), and the omission of any provision in other legislation authorizing sterilization of incompetent developmentally disabled persons, the Legislature has denied incompetent women the procreative choice that is recognized as a fundamental, constitutionally protected right of all other adult women. We realize that election of the method of contraception to be utilized, or indeed whether to choose contraception at all, cannot realistically be deemed a "choice" available to

an incompetent since any election must of necessity be made on behalf of the incompetent by others. The interests of the incompetent which mandate recognition of procreative choice as an aspect of the fundamental right to privacy and liberty do not differ from the interests of women able to give voluntary consent to this procedure, however. That these interests include the individual's right to personal growth and development is implicit in decisions of both the United States Supreme Court and this court.

In *Roe* v. *Wade, supra,* 410 U.S. 113, the court concluded that an unmarried woman's fundamental right not to bear children could be found within the right to privacy, whether the privacy right arises out of the penumbra of the First Amendment or the liberty right protected by the Fourteenth Amendment.[24] In so doing the court recognized that this interest is not limited to the intimacy of the marital relationship, but encompasses also the individual's right to determine the course of his or her future life. The court made reference to the impact denial of the right of procreative choice might have in causing a woman a "distressful life and future." (410 U.S. at p. 153 [35 L.Ed.2d at p. 177].)

■ The liberty interest which the court recognized as a substantive right protected against arbitrary deprivation by the due process clause of the Fourteenth Amendment includes the right of the individual "to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling [and] to pursue any livelihood or avocation . . . ." (*Allgeyer* v. *Louisiana* (1897) 165 U.S. 578, 589 [41 L.Ed. 832, 835, 17 S.Ct. 427]; see also *Grosjean* v. *American Press Co.* (1936) 297 U.S. 233, 244 [80 L.Ed. 660, 665, 56 S.Ct. 444].) "Liberty means more than freedom from servitude, and the constitutional guarantee is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling." (*Smith* v. *Texas* (1914) 233 U.S. 630, 636 [58 L.Ed. 1129, 1132, 34 S.Ct. 681].) "Although the Court has not assumed to define 'liberty' with any great precision, that term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective." (*Bolling* v. *Sharpe* (1954) 347 U.S. 497, 499-500 [98 L.Ed. 884, 887, 74 S.Ct. 693].)

■ Although denominated "habilitation" in the context of the developmentally disabled, the right in issue, one which we have no doubt is

---

[24]Both Stewart, J., in his concurring opinion (410 U.S. at p. 167 [35 L.Ed.2d at p. 193]) and Rehnquist, J., dissenting (410 U.S. at p. 171 [35 L.Ed.2d at p. 196]) acknowledge the reliance of the majority on the substantive due process protection of the Fourteenth Amendment.

entitled to constitutional protection, is the right of every citizen to have the personal liberty to develop, whether by education, training, labor, or simply fortuity, to his or her maximum economic, intellectual, and social level. That all persons may not seek to exercise this right in no way diminishes its importance. It lies at the core of the liberty interest protected by the Fourteenth Amendment to the United States Constitution, and article I, section 1 of the California Constitution.

An incompetent developmentally disabled woman has no less interest in a satisfying or fulfilling life free from the burdens of an unwanted pregnancy than does her competent sister. Her interest in maximizing her opportunities for such a life through habilitation is recognized and given statutory protection by both the LDDSA and the DDA. If the state withholds from her the only safe and reliable method of contraception suitable to her condition, it necessarily limits her opportunity for habilitation and thereby her freedom to pursue a fulfilling life.[25] Therefore, whether approached as an infringement of the right of privacy under the First Amendment or the privacy right that is found within the liberty protected by the Fourteenth Amendment, and whether analyzed under due process or equal protection principles, the issue is whether withholding the option of sterilization as a method of contraception to this class of women is constitutionally permissible. Because the rights involved are fundamental the permissibility of the restriction must be justified by a "compelling state interest," and may be no broader than necessary to protect that interest. (*Roe* v. *Wade, supra,* 410 U.S. at p. 155 [35 L.Ed.2d at p. 178].)

The California Constitution accords similar protection. Article I, section 1, confirms the right not only to privacy, but to pursue happiness and enjoy liberty. ▮ The right of a woman to choose whether or not to bear a child and thus to control her social role and personal destiny, is a fundamental right protected by that provision. (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252, 275.) Since the right to elect ster-

---

[25]Although specifics are lacking in this record, the impact of the restrictions necessarily placed upon sexually mature mentally retarded women in the effort to prevent pregnancy have been described elsewhere. (See, e.g., *In re Grady, supra,* 426 A.2d 467 [dependable contraception a prerequisite to participation out of home in sheltered workshop or group home]; *Matter of C.D.M., supra,* 627 P.2d 607 [controlled housing with maximum opportunity for personal independence and social interaction make it quite possible that woman would become pregnant]; *Matter of Guardianship of Eberhardy* (1981) 102 Wis.2d 239 [307 N.W.2d 881] [coeducational summer camp for retarded persons available but woman could become pregnant if not under total and complete supervision at all times].)

See also *Foy* v. *Greenblott* (1983) 141 Cal.App.3d 1 [190 Cal.Rptr. 84], holding that the failure of mental health professionals to police the sexual conduct of a gravely disabled (Welf. & Inst. Code, § 5008) conservatee is not actionable since policing of patients in institutions would violate the patients' right to the least restrictive conditions and would interfere with the patients' individual autonomy including privacy and social interaction.

ilization as a method of contraception is generally available to adult women in this state, the restriction must be justified by a compelling state interest under either article I, section 1, or under the equal protection guarantee of article I, section 7, of the California Constitution. (*Id.*, at pp. 276-277.)[26] Under equal protection analysis we must determine whether the state has a compelling interest in restricting access to sterilization for incompetent developmentally disabled adults, and, if so, whether banning all such sterilization is necessary to accomplish the state purpose. (*Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 466 [125 Cal.Rptr. 129, 541 P.2d 881].) Similarly, in assessing any restriction on the exercise of a fundamental constitutional right, we must determine whether the state has a compelling interest that is within the police power of the state in regulating the subject, whether the regulation is necessary to accomplish that purpose, and if the restriction is narrowly drawn. (*People* v. *Belous* (1969) 71 Cal.2d 954, 964 [80 Cal.Rptr. 354, 458 P.2d 194].)

■ Respondent suggests that the interest of the state in safeguarding the right of an incompetent *not* to be sterilized justifies barring all nontherapeutic sterilization of conservatees who are unable personally to consent. We do not doubt that it is within the police power of the state to enact legislation designed to protect the liberties of its residents. The inquiry does not end there, however, since the means selected are not simply protective of a liberty interest, but restrict the exercise of other fundamental rights by or on behalf of the incompetent. The state has not asserted an interest in protecting the right of the incompetent to bear children. Neither the "involuntary imposition" of other forms of contraception, nor abortion, has been banned. A conservator is permitted to exercise his or her own judgment as to the best interests of the conservatee in these matters, excepting only the election of sterilization as a means of preventing conception.

The state interest therefore must be in precluding the option of sterilization because it is in most cases an irreversible procedure. Necessarily implicit in the interest asserted by the state is an assumption that the conservatee may at some future time elect to bear children. While the prohibition of sterilization may be a reasonable means by which to protect some conservatees' right to procreative choice, here it sweeps too broadly for it extends to individuals who cannot make that choice and will not be able to do so in the future. The restriction prohibits sterilization when this means of contraception is necessary to the conservatee's ability to exercise other fundamental rights, without fulfilling the stated purpose of protecting the

---

[26]No suggestion is made here that the restriction is justified because the medical procedure poses a significant danger to the health of the patient. We need not consider, therefore, whether a lesser interest would meet the constitutional imperative. (Cf. *People* v. *Privitera* (1979) 23 Cal.3d 697, 702 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178].)

right of the conservatee to choose to bear children. That right has been taken from her both by nature which has rendered her incapable of making a voluntary choice, and by the state through the powers already conferred upon the conservator.

Respondent argues that the ban is, nonetheless, necessary because past experience demonstrates that when the power to authorize sterilization of incompetents has been conferred on the judiciary it has been subject to abuse. Again, however, the rationale fails since less restrictive alternatives to total prohibition are available in statutory and procedural safeguards as yet untried in this state. Respondent offers no evidence of abuse in other jurisdictions in which the option has been made available.

The courts of several of our sister states share our view that sterilization may not be denied to incompetent women when necessary to their habilitation if that determination is made in proceedings which accord safeguards adequate to prevent the abuses feared by respondent. Among the first to do so was the Supreme Court of Washington which, faced with the same conflicting interests, reviewed the factors to be considered in a decision to permit sterilization and suggested procedural safeguards appropriate to avoid abuse. Those procedures have since been accepted by courts in other states in which the judiciary had jurisdiction to authorize sterilization.

In *Matter of Guardianship of Hayes* (1980) 93 Wn.2d 228 [608 P.2d 635, 640-641], the Washington court concluded: "[I]n the rare case sterilization may indeed be in the best interests of the retarded person. . . . However, the court must exercise care to protect the individual's right of privacy, and thereby not unnecessarily invade that right. Substantial medical evidence must be adduced, and the burden on the proponent of sterilization will be to show by clear, cogent and convincing evidence that such a procedure is in the best interest of the retarded person.

"Among the factors to be considered are the age and educability of the individual. For example, a child in her early teens may be incapable at present of understanding the consequences of sexual activity, or exercising judgment in relations with the opposite sex, but may also have the potential to develop the required understanding and judgment through continued education and developmental programs.

"A related consideration is the potential of the individual as a parent. . . . [M]any retarded persons are capable of becoming good parents, and in only a fraction of cases is it likely that offspring would inherit a genetic form of mental retardation that would make parenting more difficult.

"Another group of relevant factors involve the degree to which sterilization is medically indicated as the last and best resort for the individual. Can it be shown by clear, cogent and convincing evidence, for example, that other methods of birth control are inapplicable or unworkable?

". . . . . . . . . . . . . . . . . . . . . .

"The decision can only be made in a superior court proceeding in which (1) the incompetent individual is represented by a disinterested guardian ad litem, (2) the court has received independent advice based upon a comprehensive medical, psychological, and social evaluation of the individual, and (3) to the greatest extent possible, the court has elicited and taken into account the view of the incompetent individual.

"Within this framework, the judge must first find by clear, cogent and convincing evidence that the individual is (1) incapable of making his or her own decision about sterilization, and (2) unlikely to develop sufficiently to make an informed judgment about sterilization in the foreseeable future.

"Next, it must be proved by clear, cogent and convincing evidence that there is a need for contraception. The judge must find that the individual is (1) physically capable of procreation, and (2) likely to engage in sexual activity at the present or in the near future under circumstances likely to result in pregnancy, and must find in addition that (3) the nature and extent of the individual's disability, as determined by empirical evidence and not solely on the basis of standardized tests, renders him or her permanently incapable of caring for a child, even with reasonable assistance.

"Finally, there must be no alternative to sterilization. The judge must find by clear, cogent and convincing evidence (1) all less drastic contraceptive methods, including supervision, education and training, have been proved unworkable or inapplicable, and (2) the proposed method of sterilization entails the least invasion of the body of the individual. In addition, it must be shown by clear, cogent and convincing evidence that (3) the current state of scientific and medical knowledge does not suggest either (a) that a reversible sterilization procedure or other less drastic contraceptive method will shortly be available, or (b) that science is on the threshold of an advance in the treatment of the individual's disability."

The Massachusetts Supreme Court, noting that denying the same right to procreative choice to persons whose disability makes them reliant on others as it extends to competent persons degrades the disabled, and therefore has construed that state's statute which prohibits sterilization except with the knowledgeable consent of the patient as permitting the consent to be given

through the court-approved substituted judgment of the parent or guardian. (*Matter of Moe* (1982) 385 Mass. 555 [432 N.E.2d 712, 720].) Although decided as a matter of statutory construction, the court concluded in that opinion that an incompetent's inability to choose "should not result in a loss of the person's constitutional interests. . . . To speak solely in terms of the 'best interests' of the ward, or of the State's interest, is to obscure the fundamental issue: Is the State to impose a solution on an incompetent based on external criteria, or is it to seek to protect and implement the individual's personal rights and integrity? We reject the former possibility. Each approach has its own difficulties, but the use of the doctrine of substituted judgment promotes best the interests of the individual, no matter how difficult the task involved may be." (*Ibid.*)

The New Jersey Supreme Court, rejecting an argument that absent statutory authority the court may not approve sterilization of an incompetent, has expressly recognized that an incompetent has the same constitutional right of privacy to choose whether or not to be sterilized as does a competent person, and has concluded that the court has inherent power to permit the procedure to be performed. "We do not pretend that the choice of [the incompetent's] parents, her guardian *ad litem,* or a court is her own choice. But it is a genuine choice nevertheless—one designed to further the same interests she might pursue had she the ability to decide herself. We believe that having the choice made in her behalf produces a more just and compassionate result than leaving [her] with no way of exercising a constitutional right. Our Court should accept the responsibility of providing her with a choice to compensate for her inability to exercise personally an important constitutional right." (*In re Grady, supra,* 426 A.2d at p. 481.) The Alaska Supreme Court reached a similar result, holding that as a court of general jurisdiction the Alaska Superior Court had the power as part of its *parens patriae* authority to entertain a petition by the guardian of an incompetent and to approve sterilization. (*Matter of C.D.M., supra,* 627 P.2d 607.)[27]

We do not suggest that the procedures adopted by these courts are the only or the best criteria and procedures adequate to simultaneously preserve the right of an incompetent person to bear children and to be free of intrusive medical and surgical procedures, while permitting the exercise by others of an incompetent's countervailing right not to bear children when the individual is incapable of personally exercising these rights. We note them by way of example as less drastic alternatives to section 2356, subdivision

---

[27]See also *In re Penny N.* (1980) 120 N.H. 269 [414 A.2d 541, 543]; *Matter of Truesdell* (1983) 63 N.C.App. 258 [304 S.E.2d 793, 806]; *Wentzel* v. *Montgomery General Hosp., Inc.* (1982) 293 Md. 685 [447 A.2d 1244, 1253-1254]; *Matter of Terwilliger* (1982) 304 Pa.Super. 553 [450 A.2d 1376, 1382-1384].

(d), under which sterilization is denied to all developmentally disabled persons who are unable to consent regardless of the effect of that denial on the quality of their lives and their ability to develop their maximum human potential. In the absence of evidence that these and similar criteria and procedures adopted in other states have proven inadequate to prevent recurrence of past abuses, respondent has failed to support the argument that section 2356, subdivision (d), is necessary to or does in fact protect the rights of incompetent developmentally disabled persons.

True protection of procreative choice can be accomplished only if the state permits the court-supervised substituted judgment of the conservator to be exercised on behalf of a conservatee who is unable to personally exercise this right. Limiting the exercise of that judgment by denying the right to effective contraception through sterilization to this class of conservatees denies them a right held not only by conservatees who are competent to consent, but by all other women. Respondent has demonstrated neither a compelling state interest in restricting this right nor a basis on which to conclude that the prohibition contained in section 2356, subdivision (d), is necessary to achieve the identified purpose of furthering the incompetent's right not to be sterilized.

Our conclusion that section 2356, subdivision (d), is constitutionally overbroad, and may not be invoked to deny the probate court authority to grant a conservator the power to consent to sterilization in those cases in which no less intrusive method of contraception is available to a severely retarded conservatee, does not open the way to unrestricted approval of applications for additional powers. Pending action by the Legislature to establish criteria and procedural protections governing these applications the procedures governing approval of intrusive medical procedures set forth in section 2357 should be adapted and applied. Those procedures are adequate to insure that the conservatee will receive independent representation, and that clear and convincing evidence of the necessity for the procedure will be introduced by the applicant as a prerequisite to judicial approval. In ruling on such applications the court should consider the criteria developed by the Washington Supreme Court in *In Matter of Guardianship of Hayes, supra,* 608 P.2d 635, 640-641, as well as any other relevant factors brought to the attention of the court by the parties and give approval only if the findings enumerated by that court have been made on the basis of clear and convincing evidence. In order to ensure that careful consideration is given to the determinative factors, and that meaningful appellate review may be accorded an order granting or denying an application for approval of the power to consent to sterilization of a conservatee the court should identify evidence on which it relies in support of those findings.

■ The record in this case is inadequate to establish that the trial court erred in denying the application by appellants. Inasmuch as the trial court believed that it lacked power to grant the application the record is devoid of any specification of the factors which the court found relevant, or any findings as to their existence. Nor would the evidence support an order granting the application. Although there is an implicit assumption by the parties and the trial court that Valerie may become pregnant, there is no evidence in this record that she is capable of conceiving. Even were we to accept this assumption arguendo there is no evidence that less intrusive methods of preventing conception are unavailable to Valerie. There is medical evidence that an intrauterine device is contraindicated in Valerie's case, but the only other evidence regarding alternative methods of birth control is the testimony of Valerie's mother that several years ago Valerie became ill and refused to ingest birth control pills. The record does not reveal whether more than one formulation of birth control pill was tried,[28] or whether alternative methods of administering these contraceptive drugs are available and were considered.

Even as to those intrusive medical procedures permitted after court authorization the Legislature has required a judicial determination that the condition of the conservatee "requires the recommended course of medical treatment." (§ 2357, subd. (h)(1).) Here there was neither a finding that sterilization is "required" nor evidence that would support such a finding. Under these circumstances the order of the trial court denying appellants' petition was proper.[29]

Inasmuch as there was neither evidence of necessity for contraception, nor sufficient evidence that less intrusive means of contraception are not presently available to Valerie, the judgment is affirmed. The affirmance is, however, without prejudice to a renewed application for additional powers at such time as appellants have available adequate supporting evidence.

Mosk, J., Broussard, J., and Kaus, J.,* concurred.

**REYNOSO, J.**—I concur and dissent. I concur in the affirmance of the judgment. On this record Valerie should not be subjected to an operation.

---

[28]Forty-nine oral contraceptives are identified in the 1984 Physicians' Desk Reference (38th ed. 1984) 214 (hereafter 1984 PDR), many of which vary both as to composition and strength. Manufacturers' information included in PDR also indicates that while nausea is an occasional side effect it is so during the initial cycle. (See, e.g., 1984 PDR, pp. 1428, 1490, 1845.)

[29]When a ruling or decision is correct the reasoning on which it is based is irrelevant. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

I dissent, based on much of the Chief Justice's analysis, from the majority's conclusion that the present statutory scheme denies the developmentally disabled the right of privacy. The Legislature, after study of the sad historical reality pertaining to sterilization of developmentally disabled, has decreed that those official actions cease. That was a prudent and constitutionally permitted legislative action.

**LUCAS, J.,** Concurring and Dissenting.—I concur in the affirmance of the judgment, but I cannot join in the majority's analysis which leaves open the possibility of Valerie N.'s sterilization, done in the name of her "habilitation."

Our opinion in *In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282], affords an illuminating backdrop for this case. There, we considered a scheme under which nonobjecting mentally retarded persons incompetent to request hospital placement could "voluntarily" be so placed at the request of a person other than a duly authorized conservator or guardian. No judicial determination of disability or need for such placement was required. In the course of disapproving that procedure, we noted a contradiction inherent in the scheme: "Hop is presumed sufficiently *competent* to understand the need for her to object to her placement when it has been initiated by a third party, her mother. At the same time she is presumed *incompetent* to a degree which would prevent her from requesting admission or, once confined, obtaining unilaterally and without review her own release." (*Id.,* at p. 90.)

The analytical fallacy we explored in *Hop* is echoed and expanded upon in the present case. The majority acknowledges that the incompetent is, by definition, unable to make a choice. Nonetheless, it concludes that "she has a constitutional right to have these decisions made for her, in this case by her parents as conservators, in order to protect her interests in living the fullest and most rewarding life of which she is capable." (*Ante,* at p. 160.) However, while she has a constitutional right to have a "substituted choice" made on her behalf to effectuate her constitutional rights to be free of her procreative capabilities in order to advance her right to habilitation, the former "right" is severely circumscribed by the assertion that there is no intention to "open the way to unrestricted approval of applications for additional powers" to enable sterilizations to take place. (*Ante,* at p. 168.) The sweeping terminology utilized to discern constitutional imperatives permitting sterilization suddenly narrows when the significant past abuses in this area are recalled. To that end the majority proposes adoption of an "adapted" version of Probate Code section 2357's requirements to be applied in conjunction with the standards enunciated by the Washington Su-

preme Court in *Matter of Guardianship of Hayes* (1980) 93 Wn.2d 228 [608 P.2d 635, 640-641].

As the majority mentions, and the Chief Justice's dissent emphasizes, the history of sterilization of mentally incompetent persons is not one of which we should be proud. My colleagues refer to the "prevalent attitude, reflective of the limited knowledge of the nature of developmental disabilities then available." (*Ante,* at p. 152, fn. 8.) Many of those responsible for eugenic sterilizations acted in accord with those "prevalent" views and out of high personal and societal motives. Nonetheless, the extremes to which eugenics could be misapplied were more than amply demonstrated during World War II.

I find fundamentally problematic my colleagues' conclusion that there is a constitutional right to "substituted consent" in this context. The statutory scheme providing for habilitation *concededly* does not itself permit sterilization of persons such as Valerie. The majority nonetheless has transmuted the *process* of habilitation set forth in the applicable laws into a constitutional "right" which encompasses the "right" to be sterilized if one's conservator so elects. I worry whether the "rights" which we are "protecting" are in fact more likely to become those of the incompetent's caretaker.

In *In re Hop, supra,* we expressly considered the argument that we should afford deference to those like Ms. Hop's mother who acted in the best interests of their charges. We responded: "In justifying disparate treatment of the developmentally disabled, we are unable to substitute for constitutional safeguards the admitted good intent both of the state and of those treating the developmentally disabled . . . ." (29 Cal.3d at p. 93.) Here, that "good intent" is used as a basis for concluding that an incompetent has a constitutional right to sterilization which outweighs her rights to be free of intrusive medical procedures and to retain her procreative capacity.

It is especially interesting to take a closer look at the record which has produced the majority's exegesis on constitutional rights. Petitioner presented in support of the application for sterilization the briefest of written declarations by Valerie's pediatrician and a counselor specializing in working with developmentally disabled clients. Valerie's pediatrician, after observing that Valerie was mentally retarded apparently as a result of Down's syndrome, stated in relevant part: "4. I am aware of the family's desire to have a tubal ligation performed on VALERIE. This operation will permanently sterilize but not unisex [*sic*] the conservatee. [¶] 5. In my opinion this procedure is advisable and medically appropriate in that a potential pregnancy would cause psychiatric harm to VALERIE." That is the sum and substance of the doctor's evidence. Significant in this offering are his men-

tion of "the family's desire" to have the operation performed and the complete lack of information showing that as a pediatrician he had the training and the relevant information necessary to determine what might or might not affect Valerie's psychiatric well-being. I wonder what effect we would give a similar conclusory declaration by an obstetrician that a patient's broken leg would cause "psychiatric harm."

The next declaration was by a licensed counselor holding a master's degree in developmental psychology. The counselor specializes in "behavior management with developmentally disabled clients" and has acted as a vendor providing services to clients connected with regional centers set up to serve the developmentally disabled. She had worked with Valerie weekly for approximately one year ending about two years before the court hearing. The counselor declared that "From my numerous contacts with VALERIE as well as her family, I am of the opinion that a tubal ligation is an appropriate means of guarding against pregnancy." Specifically she had observed "VALERIE act affectionately" towards men and had worked with Valerie's family "on VALERIE's problem concerning her inappropriate sexual attention to adult males." No specifics regarding the conduct involved are provided.

After reciting these factors, the counselor states "Because of the parents' fear of a pregnancy which might result from VALERIE's inappropriate sexual advances, they have felt compelled to overly restrict her social activities. This close monitoring has severely hampered her from being able to form social relationships appropriate to her developmental level." The focus is on the *parents'* fears and the conclusion they have "overly restricted" Valerie's activities. No actual description of the supervision afforded Valerie or any alternatives available is given. Nor is there mention of whether there might be ways to modify the parents' conduct if indeed they are "*overly* restrictive."

The declaration then concludes "It is my professional opinion that if VALERIE were to become pregnant, the pregnancy itself would have severe psychologically damaging consequences to VALERIE." Moreover, "[b]ecause of VALERIE's severe mental retardation there appears to be in my judgement [*sic*] no alternative birth control measures available to her which would guarantee that she would not become pregnant." As in the pediatrician's report, there is no specific basis given for the conclusion that Valerie would be psychologically harmed by pregnancy. If the harm is the same as that which would occur to any similarly disabled person, then the specter of wholesale sterilization of such persons looms more concrete. Indeed, there is absolutely nothing in the medical evidence presented that significantly differentiates Valerie's medical and psychological condition from that of any other severely developmentally disabled woman in similar circumstances.

In addition to this information, Valerie's mother and conservator testified at the hearing. She stated Valerie's social behavior was "not acceptable." Valerie was not, to her knowledge, sexually active, "[b]ut she is very aggressive, very affectionate—likes boys." Her conduct included hugging, kissing, climbing on men and wanting to sit on their laps.

As to training, behavior modification had been tried: "Shaking hands, you know, not being so aggressive." Valerie remained "aggressive." When Valerie was in her early teens, two kinds of birth control pills were tried, but she "rejected [them] and became ill." Therefore, according to Valerie's mother, the pediatrician recommended tubal ligation to avoid potential psychological and medical problems. Valerie had not cooperated in attempts to have a pelvic examination. Finally, when asked why sterilization of Valerie was sought, her mother stated "Because I do not wish her to become pregnant, but I would still like her to be able to broaden her social activities."

The above constitutes the relevant medical and psychological information presented to the court. After hearing argument, the trial judge stated that "I think, sterilization, from what I've heard, I think it is desirable and should be ordered." He concluded that "on the basis of what I've heard so far, I would rule sterilization is in order except for the lack of jurisdiction." (See *Guardianship of Tulley* (1978) 83 Cal.App.3d 698 [146 Cal.Rptr. 266]; Prob. Code, § 2356, subd. (d).)

The point of my recitation of the facts adduced at the hearing and the trial judge's response is not to cast aspersions on the sincere beliefs and good intentions of those concerned with Valerie's welfare. Rather, it is to demonstrate that on this skimpy and, I believe, totally inadequate record the trial court, but for clear restraints, would have ordered sterilization. Moreover, on this record the majority of this court has seen fit to posit a denial of constitutional rights. Consider the situation of other incompetents who might be deemed incapable of making decisions regarding sterilization, such as the mentally ill or juveniles. It is clear to me that any appellate court would consider the inadequacies of this record woefully apparent and find it an insufficient basis for concluding that sterilization should be authorized. The difference when we consider the case of the developmentally disabled arises in large part, I submit, because of societal attitudes, as well as the admittedly significant problems which may be involved in their care. The difficulty, however, is that those responsible for the decision may be more willing, for the sake of convenience and relying upon the benevolence of those making the request, to allow such surgery. However, generalized "good intentions" simply are not enough to support the constitutional framework erected by the majority.

My fear of the potential for abuse of the sterilization procedure is neither embroidered out of whole cloth, nor alleviated by the assertion that eugenics and convenience for the caretaker and society are now historic anomalies. The Chief Justice's citation to recent cases where, for example, parental consent was deemed adequate to permit sterilization demonstrates that the misuse of sterilization in such a way is still quite possible. (See *post,* at p. 177, fn. 5 (dis. opn. by Bird, C. J.).) Under the circumstances, I cannot conclude that the Legislature's determination that barring sterilization of those unable to consent to the procedure amounts to an unconstitutional invasion of an incompetent's rights.[1]

Our purpose here is to consider whether Probate Code section 2356, subdivision (d), prohibiting sterilization of incompetents such as Valerie, is unconstitutional. I conclude that whether one uses a compelling state interest or rational basis test to measure this regulation, the Legislature had sufficient cause to act as it did. It may well have decided that in light of past history the risks of abuse for those incompetent to consent to sterilization were simply too great. It may therefore justifiably have determined that to allow an exercise of discretion in this arena by courts and those responsible for the care of the incompetent posed an unacceptable hazard. The approach selected is further supported by the fact that not only is the nature of the procedure contemplated such that it is irreversible, but also the interests of those concerned may be served by utilizing other available alternatives to avoid unwanted pregnancies.

In conclusion, I cannot join with the majority in finding that the Legislature's action amounted to an unconstitutional intrusion into the rights of Valerie N. or any similarly situated incompetent person. The Legislature may well have found a compelling state interest in limiting the power of even the best-intentioned persons. The state of the record here, although found by the majority insufficient to support sterilization under the new standards enunciated, nonetheless serves only to heighten my concern that sterilization of persons such as Valerie will become pro forma commonplace occurrences even under the standards proposed. With that I cannot agree.

**BIRD, C. J.**—I respectfully dissent.

Today's holding will permit the state, through the legal fiction of substituted consent, to deprive many women permanently of the right to conceive and bear children. The majority run roughshod over this fundamental constitutional right in a misguided attempt to guarantee a right of procreative

---

[1]Of course, sterilization necessitated by an incompetent's medical condition would be permissible under the present statutory scheme.

*choice* for one they assume has never been capable of choice and never will be. Yet precisely because choice and consent are meaningless concepts when applied to such a person, the majority's invocation of the theory of procreative choice and the fiction of substituted consent cannot withstand constitutional scrutiny.

The majority opinion opens the door to abusive sterilization practices which will serve the convenience of conservators, parents, and service providers rather than incompetent conservatees. The ugly history of sterilization abuse against developmentally disabled persons in the name of seemingly enlightened social policies counsels a different choice.

Fortunately, the Legislature has already made that choice. The state has a compelling interest in protecting the fundamental right of its citizens to bear children. The prohibition on sterilization of incompetent conservatees in Probate Code section 2356, subdivision (d) is necessary to effectuate that interest.[1] I would hold that section 2356, subdivision (d) is constitutional and, on that basis, affirm the judgment.

## I.

The history of involuntary sterilization of incompetent, developmentally disabled individuals over the past 80 years is a history of wholesale violations of constitutional rights carried out with the approval of the highest judicial tribunals. (See, e.g., *Buck* v. *Bell* (1927) 274 U.S. 200 [71 L.Ed. 1000, 47 S.Ct. 584].) In the first half of this century, approximately 60,000 people were subjected to compulsory sterilization in the United States. A disproportionate number of these operations was carried out in California— nearly 20,000 between 1900 and 1960. (See State Council on Developmental Disabilities, Cal. Developmental Disabilities State Plan, 1984-1986, pp. 58-59 [hereafter *State Plan*].)[2]

This phenomenon was fueled by a widely held but incorrect belief that virtually all developmental disabilities were inherited and could be eliminated by preventing those affected from reproducing.[3] (Price & Burt, *Sterilization, State Action, and the Concept of Consent* (1975) 1 L. & Psychol-

---

[1] All subsequent statutory references are to the Probate Code unless otherwise noted.

[2] Many of the compulsory sterilizations performed in this state were undertaken on the same rationale advocated by the majority in this case—that sterilization was necessary in order to permit developmentally disabled persons unsupervised social contact with members of the opposite sex. (*State Plan, supra,* at pp. 58-59.)

[3] This theory, known as "negative eugenics," was also applied to the mentally ill and to persons convicted of certain types of crime. (See Note, *Eugenic Sterilization—A Scientific Analysis* (1969) 46 Denver L.J. 631.)

ogy Rev. 57, 61-62 [hereafter *The Concept of Consent*]; Burghdorf & Burghdorf, *The Wicked Witch Is Almost Dead: Buck v. Bell and the Sterilization of Handicapped Persons* (1977) 50 Temple L.Q. 995, 1007-1008 [hereafter *The Wicked Witch*].)

It is now recognized that many forms of mental retardation have no hereditary component, while in others heredity is but one of several contributing factors. (*Matter of Guardianship of Hayes* (1980) 93 Wn.2d 228 [608 P.2d 635, 640]; Brakel & Rock, The Mentally Disabled and the Law (rev. ed. 1971) p. 211 [hereafter *Brakel & Rock*]; Robitscher, Eugenic Sterilization (1973) pp. 113-116; Friedman, The Rights of Mentally Retarded Persons (1976) pp. 115-117.) Eighty to ninety percent of mentally disabled children are born to normal parents. (Murdock, *Sterilization of the Retarded: A Problem or a Solution?* (1974) 62 Cal.L.Rev. 917, 926 [hereafter *Problem or Solution*].)

The majority scarcely acknowledge this shameful history. Instead, they quote at length and largely without comment from the statutes and decisions which made such abuses possible. When they do comment, it is to explain sympathetically that the legal justifications advanced during that period were merely expressions of "[t]he prevalent attitude, reflective of the limited knowledge of the nature of developmental disabilities then available . . . ." (Maj. opn., *ante,* at p. 152, fn. 8.) The extensive literature recording the scope of the abuses and the constitutional infirmities of the statutes and decisions which permitted them is cavalierly ignored.[4]

Most importantly, the majority fail to note that abuses continue to occur. For example, the North Carolina Court of Appeals recently permitted the involuntary sterilization of a 23-year-old woman on the grounds that she was mildly retarded and "had exhibited emotional immaturity, the absence of a sense of responsibility, a lack of patience with children, and continuous nightly adventures with boyfriends followed by daily sleep and bedrest. Such conduct and personality traits in addition to mental retardation," the court said, "clearly . . . show that respondent failed to meet any acceptable standard of fitness to care for a child by providing a reasonable domestic

---

[4]See, e.g., *Problem or Solution, supra,* 62 Cal.L.Rev. 917; *The Concept of Consent, supra,* at pages 62-65; Comment, *Sterilization of the Developmentally Disabled: Shedding Some Myth-Conceptions* (1981) 9 Fla.St.U. L.Rev. 599 [hereafter *Shedding Myth-Conceptions*]; Kindregan, *Sixty Years of Compulsory Eugenic Sterilization: "Three Generations of Imbeciles" and the Constitution of the United States* (1966) 43 Chi.-Kent L.Rev. 123; *The Wicked Witch, op. cit. supra,* 50 Temple L.Q. 995; Note, *In re Grady: The Mentally Retarded Individual's Right to Choose Sterilization* (1981) 6 Am. J. L. & Med. 559, 568-570 [hereafter *Right to Choose*]; Note, *Eugenic Sterilization—A Scientific Analysis, op. cit. supra,* 46 Denver L.J. at page 642; *Maxon v. Superior Court* (1982) 135 Cal.App.3d 626, 632 [185 Cal.Rptr. 516]; *Matter of A. W.* (Colo. 1981) 637 P.2d 366, 368-369.)

environment." (*Matter of Johnson* (1980) 45 N.C.App. 649 [263 S.E.2d 805, 809]; see *Problem or Solution, op. cit. supra,* at pp. 928-932 [arguing against parental unfitness as a basis for sterilization of developmentally disabled persons on overbreadth and underinclusiveness grounds]; *Brakel & Rock, op. cit. supra,* at p. 217; *The Concept of Consent, op. cit. supra,* at pp. 72-73.)[5]

Of course, compulsory sterilization, initiated by the state, is not the issue in this case. As the majority note, California no longer has a compulsory sterilization statute. (See former Welf. & Inst. Code, § 7254, repealed by Stats. 1979, ch. 730, § 156.5, p. 2540; maj. opn., *ante,* at p. 150.) However, the history of compulsory sterilization under such statutes provides the frame of reference for evaluating the constitutionality of the Legislature's ban on sterilization of incompetent conservatees. It is also useful in assessing the ostensibly "consensual" approaches which have been adopted in other states and which the majority adopt today.

As Professors Price and Burt have argued, the trend away from compulsory sterilization and toward sterilization on the basis of substituted consent obscures the fact that the issue remains one of state action threatening the fundamental right of procreation. "Forms of state control and intervention change and become so sophisticated, appealing, subtle, and delicate that modern governmental action seems to be less and less restricted by an ordinary application of constitutional protections. For example, when government intervention primarily took the form of institutionalization, particularly compulsory institutionalization, certain ideals of due process which had developed in the criminal law system could be brought to bear . . . to increase the protection of the individual from arbitrary state action . . . .

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

---

[5]This is not to suggest that contemporary sterilization abuse is attributable solely to compulsory sterilization statutes. (See, e.g., *Stump* v. *Sparkman* (1978) 435 U.S. 349 [55 L.Ed.2d 331, 98 S.Ct. 1099] ["[s]omewhat retarded" 15-year-old girl sterilized without her knowledge after judge approved her mother's petition to authorize the operation in an ex parte proceeding without notice to the daughter, appointment of a guardian ad litem, or hearing]; *Downs* v. *Sawtelle* (1st Cir. 1978) 574 F.2d 1, 5-6 [21-year-old deaf-mute woman sterilized with consent of her spendthrift guardian by doctor whose report recommended the operation " 'based 90% on this girl's low mentality involving poor judgment and her lack of restraint on sex appetite and its consequences' "].)

As the Colorado Supreme Court has explained, "[c]onsent by parents to the sterilization of their mentally retarded offspring has a history of abuse which indicates that parents, at least in this limited context, cannot be presumed to have an identity of interest with their children. The inconvenience of caring for the incompetent child coupled with fears of sexual promiscuity or exploitation may lead parents to seek a solution which infringes their offspring's fundamental procreative rights." (*Matter of A. W., supra,* 637 P.2d at p. 370, fn. omitted.)

"When a modern state determines to intervene, for example by means of . . . sterilization, it offers modern justifications. 'Positive eugenics' are no longer in vogue, but the intense competition for tax dollars has merely replaced genetic considerations with fiscal and psychological ones. Where the Holmes[] statement, 'three generations of imbeciles are enough,' was sufficient to uphold the constitutionality of intervention by sterilization a half-century ago, we talk confidently in the compulsory 1970's about 'parenting,' of 'breaking the vicious cycle' of three generations of welfare clients. Beyond these justifications, there is an additional factor . . .: through adroit statutory change and through nonstatutory efforts to confer power to consent on persons other than the individual directly affected, the always thin line between involuntary and voluntary action has been further attenuated to the point of disappearance." (*The Concept of Consent, op. cit. supra,* at pp. 59-60, fns. omitted.) Writing in 1975, Price and Burt predicted "a trend toward third-party consent to cover many transactions that would have been justified by pure state intervention at a time when such action was more palatable and available." (*Id.,* at p. 78.)

That prediction has been borne out in the intervening years. Courts in a number of jurisdictions without compulsory sterilization statutes or where such statutes had been repealed or were inapplicable under the circumstances of a particular case have permitted third persons to consent to sterilization of incompetent, developmentally disabled women. (See *Matter of Guardianship of Hayes, supra,* 608 P.2d at pp. 638-641; *Matter of C. D. M.* (Alaska 1981) 627 P.2d 607, 610; *Matter of A. W., supra,* 637 P.2d at pp. 370-375; *Matter of Moe* (1982) 385 Mass. 555 [432 N.E.2d 712, 719-720]; *In re Grady* (1981) 85 N.J. 235 [426 A.2d 467, 480-481]; *Ruby* v. *Massey* (D. Conn. 1978) 452 F.Supp. 361, 368-369.)

Like the majority here, these courts have turned to the substituted consent device after concluding that the right to be sterilized is an aspect of a constitutional right of procreative choice enjoyed equally by all persons, whether or not they are developmentally disabled. The justifications that have been advanced for applying both the underlying constitutional theory of procreative choice and the doctrine of substituted consent to individuals who never were and never will be capable of choice cannot withstand critical scrutiny. Because the majority's use of the procreative choice theory presents the more fundamental problem, it will be addressed first. A detailed critique of the majority's use of the substituted consent doctrine will follow.

## II.

That the "right to have offspring" is a fundamental right was first recognized in *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 536 [86 L.Ed. 1655, 1657, 62 S.Ct. 1110]. That case involved Oklahoma's Habitual Criminal

Sterilization Act, which, with exceptions for certain white collar crimes, permitted sterilization for multiple convictions of felonies involving moral turpitude. The high court held the statute violated the equal protection clause as applied to a man who had been convicted once of stealing chickens and twice of robbery.[6]

None of the opinions in *Skinner* characterized the right to procreate as a right of choice or privacy.[7] Rather, the majority referred to the right to bear and beget children as "a basic liberty" and as "one of the basic civil rights of man." (*Id.,* at p. 541 [86 L.Ed. at p. 1660].) In a concurring opinion, Justice Jackson observed that involuntary sterilization implicated "the dignity and personality and natural powers of a minority . . . ." (*Id.,* at p. 546 [86 L.Ed. at p. 1663].) In another concurring opinion, Chief Justice Stone spoke of involuntary sterilization as an invasion of the personal liberty of the individual. (*Id.,* at p. 544 [86 L.Ed. at p. 1662].)[8]

The terms employed by the *Skinner* opinions suggest that the interests implicated by sterilization are more primal than the retention of control over decisions in important areas of personal life. As one commentator has observed, "the great conceptual background for due process privacy law [is] bodily autonomy . . . . At present only the most powerless members of society appear to need to rely on the Constitution for such a basic right. The courts have . . . recognized individual liberty in things of the body as a touchstone." (Note, *Due Process Privacy and the Path of Progress* (1979) U. Ill. L. F. 469, 515 [hereafter *Due Process Privacy*]; *id.,* at pp. 504-505; see *Union Pacific R. Co.* v. *Botsford* (1891) 141 U.S. 250, 251-252 [35 L.Ed. 734, 737, 11 S.Ct. 1000] [common law right of personal injury plaintiff to be free of compulsory physical examination], cited in *Roe* v. *Wade* (1973) 410 U.S. 113, 152 [35 L.Ed.2d 147, 176, 93 S.Ct. 705]; *Schmerber*

---

[6]The court observed that "[t]he power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither and disappear." (*Skinner* v. *Oklahoma, supra,* 316 U.S. at p. 541 [86 L.Ed. at p. 1660].) *Skinner* has thus been described as "the leading instance in which a new star appears to have been added to the firmament of preferred freedoms primarily because of concerns about invidious discrimination and majoritarian domination." (Tribe, American Constitutional Law (1978) p. 1011.)

[7]The high court first referred to *Skinner* as a privacy case 23 years later when it struck down a statute forbidding use of contraceptives. (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515, 85 S.Ct. 1678]; see also *Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453-454 [31 L.Ed.2d 349, 362-363, 92 S.Ct. 1029]; *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 34, fn. 76 [36 L.Ed.2d 16, 44, 93 S.Ct. 1278].)

[8]For one of the concurring justices, "the only facts which could justify so drastic a measure" would be proof of the inheritability of the individual's "socially injurious tendencies." (*Skinner* v. *Oklahoma, supra,* 316 U.S. at p. 544 [86 L.Ed. at p. 1662] (conc. opn. of Stone, C. J.); see *id.,* at p. 546 [86 L.Ed. at pp. 1662-1663] (conc. opn. of Jackson, J.).)

v. *California* (1966) 384 U.S. 757, 778-779 [16 L.Ed.2d 908, 924, 86 S.Ct. 1826] (dis. opn. of Douglas, J.); *Breithaupt* v. *Abram* (1957) 352 U.S. 432, 441-442 [1 L.Ed.2d 448, 454, 77 S.Ct. 408] (dis. opn. of Warren, C. J.); *id.,* at pp. 443-444 [1 L.Ed.2d at p. 455] (dis. opn. of Douglas, J.).)

Our own courts have recognized that the right to procreate has roots that go deeper than and do not depend upon a capacity for rational choice. "[T]he preservation of one's *bodily reproductive functions* is a fundamental right, and the termination thereof constitutes a serious invasion of the sanctity of the person." (*Guardianship of Tulley* (1978) 83 Cal.App.3d 698, 705 [146 Cal.Rptr. 266], italics added.)

By contrast, sterilization, abortion, and contraception all necessarily involve the exercise of choice. Hence, restrictions or prohibitions on such choices implicate not only the fundamental right to procreate recognized in *Skinner* but also the right to *choose* not to procreate. The courts have invoked the constitutional right of privacy to strike down statutes which prohibit or unduly restrict access to contraceptive devices and information, abortion, and voluntary sterilization. The individual's right to make her own decision in this highly personal area was stressed. In *Eisenstadt* v. *Baird, supra,* 405 U.S. 438, a contraception case, the United States Supreme Court recast the right of privacy first recognized in *Skinner* as "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the *decision* whether to bear or beget a child." (*Id.,* at p. 453 [31 L.Ed.2d at p. 362], italics added and omitted.)

Other decisions have sounded the same theme. (See *Roe* v. *Wade, supra,* 410 U.S. at p. 153 [35 L.Ed.2d at p. 177] [the right of privacy is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy"]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 263 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; *People* v. *Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194]; *Jessin* v. *County of Shasta* (1969) 274 Cal.App.2d 737, 748 [79 Cal.Rptr. 359, 35 A.L.R.3d 1433] [privacy right to seek sterilization].) Even Justice Douglas, the author of the majority opinion in *Skinner,* later referred to the existence of a body of fundamental privacy rights safeguarding "freedom of *choice* in the basic *decisions* of one's life respecting marriage, divorce, procreation, contraception, and the education and upbringing of children." (*Doe* v. *Bolton* (1973) 410 U.S. 179, 211 [35 L.Ed.2d 201, 187, 93 S.Ct. 1410] (conc. opn. of Douglas, J.), italics added.)

With regard to individuals competent to make such decisions, the recognition of a comprehensive right of procreative choice, linking the right to

procreate with the right to prevent procreation through sterilization or other less permanent means, was a positive and logical advance. Yet if applied unaltered to incompetent, developmentally disabled individuals, the concept of procreative choice obscures more than it clarifies.

The choice model creates a false impression of equivalence between the "decision" to procreate and the "decision" to be sterilized. On closer examination, it is apparent that only the right to be sterilized is necessarily premised on a capacity for rational, informed choice and decision. Sterilization, like abortion and the use of contraceptives, requires a conscious decision by someone aware of the significance of pregnancy and childbearing. Sterilization and abortion in particular, as medical procedures, clearly take place only as the result of choices made by individuals aware of the consequences of their actions. By contrast, procreation is a natural function which can and often does occur without the exercise of a rational or knowing choice. This is true for both competent and incompetent individuals.

Thus, a constitutional theory which treats the right to *prevent* procreation as an aspect of a larger right of procreative choice is sensible, since the actions necessary to exercise the right require conscious choice and decision. On the other hand, the right to procreate is more than a byproduct of a right of choice. Its roots go deeper; they are *constitutional* in the physical sense, implicating the individual's rights to physical integrity and to retention of the biological capabilities with which he or she was born into this world. Hence, even in the case of a mentally competent individual, it is somewhat illogical to treat the right to procreate solely as a matter of control over basic personal decisions. In the case of a permanently incompetent individual, such logic has no place whatsoever. (See *Matter of Storar* (1981) 438 N.Y.S.2d 266 [420 N.E.2d 64, 71-73] [fundamental right to life paramount to right to decline medical treatment where terminally ill patient has never been competent to understand or make a reasoned decision about medical treatment].)

In their discussion of appellants' equal protection challenge, the majority disregard these differences between the right to procreate and the right to prevent procreation. By adopting the procreative choice model, they assume that, regardless of whether the woman is competent or incompetent, the sterilization decision requires the same choice between equally weighted competing interests. The majority conclude in essence that the state's interest in protecting a severely disabled woman's right to procreate is not sufficiently compelling to justify the denial of her right to be sterilized. This reasoning cannot withstand scrutiny.

Unlike the right to bear children, the right to be sterilized is a function of the capacity for rational choice, a capacity the incompetent, develop-

mentally disabled woman lacks. Thus, the balance between the two rights is not the same for an incompetent, developmentally disabled woman as it is for her competent, nondisabled counterpart.

In the case of an incompetent, severely disabled woman, the conditions upon which to premise a constitutional right to be sterilized are essentially nonexistent. By contrast, her right to procreate, which is not rooted in or dependent upon a capacity for informed decision, is undiminished. Indeed, it requires even greater protection due to her legally dependent status and limited capacity to defend her own rights. In this context, the state's interest in prohibiting sterilization is a compelling one.

The majority also find a constitutional right to sterilization in Valerie's due process liberty interest in minimizing restrictions on her social interactions. (See maj. opn., *ante,* at pp. 161-163.) That conclusion is flawed by the absence of any showing that the restrictions are truly necessary and by the majority's failure to balance the deprivation of liberty resulting from such restrictions against the irreversible loss of her fundamental right to procreate if she is sterilized.

The majority concede the inadequacy of the evidence as to the nature and effects of the restrictions placed on Valerie's activities in the attempt to prevent her becoming pregnant. However, relying on descriptions in other cases, they readily assume that unacceptable restrictions are "necessarily placed upon sexually mature mentally retarded women in the effort to prevent pregnancy . . . ." (Maj. opn., *ante,* at p. 163, fn. 25.)

In this case, the restrictions on Valerie's activities have been imposed by her parents rather than by the state. Nonetheless, it is essential to require a showing that the state has a compelling interest in preventing Valerie from becoming pregnant and that the restrictions are no broader than necessary to protect that interest. (See *Roe* v. *Wade, supra,* 410 U.S. at p. 155 [35 L.Ed.2d at p. 178].) Only then may the right to "personal growth and development" be weighed against the right of procreation. This, the majority has not attempted to do.

If such an analysis were attempted, it would become clear that any unavoidable adverse impact of the sterilization ban on a developmentally disabled, incompetent conservatee's liberty interests is insufficient to justify the permanent deprivation of her right to procreate. This conclusion flows inexorably from a comparison of the intrusions on the two rights. Sterilization results in a complete and irreversible deprivation of the right to pro-

create.[9] By contrast, any restriction on social activities that results from a ban on sterilization constitutes at most a partial deprivation of liberty.

The majority's failure to engage in a meaningful weighing of these interests is indicative of a basic problem with their analysis. In their effort to protect Valerie's rights of liberty and procreative "choice," they fail to seriously acknowledge her right to procreate. The majority make several unsupported assumptions which suggest that they recognize Valerie's right to procreate for purposes of conceptual symmetry only. They do not regard it as a *real* right, entitled to meaningful protection.

For example, the majority assert without citation to any authority that Valerie's conservators may legally compel her to undergo an abortion or to surrender custody over any child she might bear. (Maj. opn., *ante,* at pp. 160-161; but see *id.,* at p. 150 & fn. 6; *The Concept of Consent, op. cit. supra,* at pp. 72-74.) Indeed, having incorrectly cast Valerie's fundamental right to procreate as a right of procreative *choice,* the majority summarily conclude that she will never have the right to bear children because she will never be competent. "That right has been taken from her both by nature which has rendered her incapable of making a voluntary choice, and by the state through the powers already conferred upon the conservator." (Maj. opn., *ante,* at p. 165.)

I strongly disagree. As explained above, the roots of the fundamental right to procreate go deeper. A woman should not be stripped of that right by conditioning its recognition on her capacity to make informed choices.

In sum, the majority's constitutional analysis fails to give proper weight to the fundamental right to procreate. It also fails to acknowledge that the right to procreate has independent roots which, in contrast to the right to sterilization, are not linked to a capacity for decision and choice. Finally, the majority fail to weigh the impact of the irreversible deprivation of the right to procreate against the partial impairment of liberty which they cite to strike down section 2356, subdivision (d). When proper consideration is given to these questions, it is apparent that the statute's ban on sterilization, which applies only to incompetent, developmentally disabled conservatees, is constitutionally sound.

---

[9]Other methods of contraception do not irreversibly prevent procreation, nor do they require the surgical destruction of any biological capacity for a nonmedical purpose. Nothing in this opinion is intended to question the conservators' reasonable exercise of the power to select an appropriate form of contraception for Valerie. I agree with the majority that the unavailability of this option has not been sufficiently proven.

## III.

The majority's use of the substituted consent doctrine to permit sterilization of an incompetent individual underscores and exacerbates the problems inherent in applying the constitutional "choice" model which forms the core of their analysis. Like the theory of procreative choice, substituted consent derives its legitimacy from the premise that the affected individual once possessed a capacity to make informed choices or will be able to do so at some point in the future. Even so, the doctrine requires a court to engage in a questionable legal fiction. This departure from reality reaches its zenith when the third party deciding on a matter as vital as whether to undergo sterilization purports to stand in the shoes of a severely retarded adult who has since birth been incapable of making such choices.

In many situations, the law prohibits actions affecting an individual's rights without his or her informed consent. Courts developed the doctrine of substituted consent so that third persons could make decisions on behalf of incompetents in these situations. (E.g., Annot., Power of Court or Guardian to Make Noncharitable Gifts or Allowances Out of Funds of Incompetent Ward (1969) 24 A.L.R.3d 863; see generally *Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417, 431].)

The substituted consent doctrine is often invoked to permit surgery on incompetent conservatees, since a surgical operation performed without consent is a battery. (See §§ 2355, 2357; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 199, 200, pp. 2485-2486.) On similar grounds, substituted consent is also employed to permit consent by parents or guardians to surgery on minors. (See § 2353; 4 Witkin, *supra*, at p. 2486.) The familiarity of the doctrine in the surgery context explains why courts have so readily turned to it when confronted with a request to authorize the surgical sterilization of an incompetent, developmentally disabled individual. (See *Right to Choose, op. cit. supra*, at pp. 565-566.)

Substituted consent is problematic even in cases where the affected individual once possessed the capacity to make informed decisions. In the well-known Karen Quinlan case, a 22-year-old woman who had fallen into a permanent coma was living in a "non-cognitive, vegetative" state. (*Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 664, 79 A.L.R.3d 205].) The New Jersey Supreme Court invoked the substituted consent doctrine to permit a parent and guardian, with the concurrence of other family members, attending physicians, and a medical ethics committee, to consent to the removal of life-support equipment. (*Id.*, at p. 671.)

The court held that the constitutional privacy right of the comatose woman included the right to decline physically invasive and seemingly pointless

treatment.[10] (*Quinlan, supra,* 355 A.2d at p. 664.) It concluded that this right could only be protected by permitting "the guardian and family of Karen to render their best judgment . . . as to whether she would exercise it in these circumstances." (*Ibid.*)[11]

Several constitutional scholars, while sympathizing with the plight of the Quinlan family, have questioned the court's constitutional analysis as well as its application of the substituted consent doctrine. Professor Tribe has observed that "[g]iven the supposedly vegetative state that alone justified the court's holding, attributing 'rights' to Karen at all was problematic; more realistically at stake were the desire of her anguished parents to be rid of their torment and the interest of society in freeing medical decision makers from blind adherence to a practice of keeping vegetating persons 'alive' simply out of a fear of prosecution. But to give *those* interests constitutional status even where the state interposes an objection in the interest of the child's life seems most troubling." (Tribe, American Constitutional Law, *op. cit. supra,* at pp. 936-937, fn. omitted.)

Focusing more specifically on the use of the substituted consent doctrine, Professor Kamisar has challenged the court's willingness to guess at what Karen Quinlan would want if she could decide for herself. "What the court is really saying, I believe, is that if Karen's constitutional right of privacy includes a right to elect to die and she presently lacks the capacity to choose and we cannot discern from her previous statements how she as a particular individual would have chosen, we may *surmise* that she would have chosen to die because we *presume* that the great majority of those in her situation would so chose. . . . If, in the absence of hard evidence about a patient's wishes when actually put in a *Quinlan*-type situation, a court is to indulge in presumptions, one would think that it would presume *just the opposite* of what it did in *Quinlan.*" (Kamisar, *A Life Not (or No Longer) Worth Living: Are We Deciding the Issue Without Facing It?* (Nov. 10, 1977) Mitchell

---

[10] The life-support apparatus included a respirator, a catheter, and a feeding tube.

[11] The opinion also suggests that the court considered *itself* to be capable of determining that Karen or any other lucid, competent adult would decide to disconnect life-support equipment from themselves under similar circumstances: "We have no doubt, in these unhappy circumstances, that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death." (355 A.2d at p. 663.) The court also stated that a decision by the family to terminate the life-support measures "should be accepted by a society the overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves . . . ." (*Id.,* at p. 664.)

Lecture delivered at the State University of Buffalo, quoted in *Due Process Privacy, op. cit. supra,* at p. 518, fn. 238.)[12]

If the substituted consent doctrine poses difficult problems in a case where the affected individual was once competent, those problems magnify tenfold in the case of an individual whose incompetency is lifelong. Yet, the majority rely on just such cases to support their application of the doctrine. (Maj. opn., *ante,* at pp. 166-167; *Matter of Moe, supra,* 432 N.E.2d 712; *In re Grady, supra,* 426 A.2d 467.)

In *Grady,* the New Jersey Supreme Court relied on the substituted consent analysis of *Quinlan* to hold that the parents of a developmentally disabled, noninstitutionalized, 18-year-old woman could consent on her behalf to a sterilization operation. (*Grady, supra,* 426 A.2d at pp. 480-481.) Whatever merit there may have been in authorizing the exercise of substituted consent in *Quinlan,* its use in *Grady* was logically unsupportable. Indeed, *Grady* exemplifies the way in which substituted consent fosters the ascendancy of legal fiction over reality.

In *Quinlan,* the court stressed the strong bonds of "familial love" that had existed between Karen and her family when she still possessed normal mental capacities. (See *Quinlan, supra,* 355 A.2d at p. 657.) It was pre-

---

[12]The justification for presuming, as the majority do, that Valerie would choose to be sterilized is even weaker. Research has debunked the myth that retarded persons do not object to sterilization and suffer no adverse emotional effects from the loss of their procreative capacities. This myth was reflected in *Buck* v. *Bell, supra,* where Justice Holmes opined that the loss of procreative capacity through compulsory sterilization of developmentally disabled persons is "often not felt to be a sacrifice by those concerned." (274 U.S. at p. 207 [71 L.Ed. at p. 1002].)

An exhaustive survey of scientific literature on the subject supports the opposite conclusion. One of the reports covered by the survey revealed that, "of 50 sterilized retarded individuals discharged from Pacific State Hospital (California) between 1949 and 1958, . . . 68% disapproved of the operation, while only 20% clearly approved. Only 9% of the women approved, in contrast to 35% of the men." (Roos, *Psychological Impact of Sterilization on the Individual* (1975) 1 L. & Psychology Rev. 45, 50.)

The author of the survey, then the executive director of the National Association for Retarded Citizens, summarized his conclusions as follows: "Assumptions that mentally retarded persons are insensitive to the consequences of sterilization have been vitiated by recent studies. The psychological impact of sterilization on the mentally retarded is likely to be particularly damaging in those instances where the procedure is the result of coercion and when the retarded person has not previously had children. Existential anxieties commonly associated with mental retardation are likely to be seriously reinforced by coercive sterilization of those who have had no children. Common sources of these anxieties include low self-esteem, feelings of helplessness, and need to avoid failure, loneliness, concern over body integrity and the threat of death." (*Id.,* at p. 54.)

The mildly and moderately retarded individuals surveyed were admittedly more articulate than Valerie. However, counsel for respondent argue persuasively that these individuals' perceptions of the world are more likely to correspond to Valerie's than are those of a social worker, a conservator or even a parent.

cisely the family's knowledge of Karen's way of thinking that the court believed would enable the family to determine the choice she would make if she were still capable of choosing. (See *id.*, at p. 664.)

In *Grady*, however, as in this case, there was no basis for a similar assumption. Like Valerie, the daughter in *Grady* had never been capable of articulating choices. There was not the slightest bit of evidence regarding the ability of the parents to determine that their daughters would choose to be sterilized. Hence, "a decision by the parents [was] mere speculation, rather than an ascertainment of the incompetent's preferences based on prior observations and conversations, as in *Quinlan.*" (*Right to Choose, op. cit. supra*, at p. 584; see Note (1981) 12 Seton Hall L.Rev. 96, 110-111.)

Courts in several jurisdictions have recognized the absurdity of applying the substituted consent doctrine to individuals whose incompetence is the result of severe, lifelong developmental disability. *In Matter of Storar, supra,* 420 N.E.2d 64, the New York Court of Appeals held that blood transfusions could not be withheld from a severely retarded man suffering from a terminal illness. (*Id.*, at p. 73.)

The court acknowledged the right of a competent patient to refuse medical treatment. It also recognized that a third person might be permitted to make the decision for an incompetent patient under certain circumstances. However, the court emphasized that unlike Karen Quinlan, "John Storar was never competent at any time in his life. He was always totally incapable of understanding or making a reasoned decision about medical treatment. Thus it is unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent. As one of the experts testified . . ., that would be similar to asking whether 'if it snowed all summer would it then be winter?'" (*Id.*, at pp. 72-73.) As a result, the court concluded that Storar's right to life took precedence over the right to refuse treatment which he would have had if he were competent. A judgment denying permission to continue the transfusions was reversed. (See *ibid.*)

Courts faced with requests to authorize sterilization have recognized the same problem. In *Matter of Guardianship of Eberhardy* (1981) 102 Wis.2d 539 [307 N.W.2d 881], the Wisconsin Supreme Court criticized the *Grady* court's attempt to equate "a decision made by others with the choice of the person to be sterilized. It clearly is not a personal choice, and no amount of legal legerdemain can make it so." (*Id.*, at p. 893.) In *In the Matter of Terwilliger* (1982) 304 Pa.Super. 553 [450 A.2d 1376], the court reached a similar conclusion, noting that "if the trial court . . . determines that [the conservatee] lacks the ability to make [the] choice for herself, we do not

pretend that the choice of her guardian to consent to sterilization would be her own choice." (*Id.*, at p. 1381, fn. 1; see also *Ruby* v. *Massey, supra,* 452 F.Supp. at pp. 370-371, fn. 24; *Grady, supra,* 426 A.2d at p. 487 (conc. opn. of Handler, J.); *Superintendent of Belchertown* v. *Saikewicz, supra,* 370 N.E.2d at p. 430; *In re Hop* (1981) 29 Cal.3d 82, 90-91 [171 Cal.Rptr. 721]; cf. *Farber* v. *Olkon* (1953) 40 Cal.2d 503 [254 P.2d 520].)

Commentators have expressed stronger reservations. Professors Price and Burt have attacked the use of substituted consent in the sterilization context as "nothing short of an extended conceit on the proposition of voluntariness. It is a fiction which authorizes the state to intervene because a party other than the subject provides the green light. Often that third party is the parent of the subject individual, but the doctrine is equally applicable when the third party is . . . a guardian ad litem[] or a conservator. By characterizing the transaction as 'consensual' rather than 'compulsory,' third-party consent allows the truly involuntary to be declared voluntary, thus bypassing constitutional, ethical, and moral questions, and avoiding the violation of taboos. Third-party consent is a miraculous creation of the law—adroit, flexible, and useful in covering the unseemly reality of conflict with the patina of cooperation." (*The Concept of Consent, op. cit. supra,* at p. 58, fns. omitted.)

Other writers have stressed the inability of the third person to know the wishes of the incompetent individual. "While substituted parental consent may be legally and morally appropriate in circumstances with less potentially harmful results, parental consent in [the] non-therapeutic sterilization context is less legitimate, for it may not be easily presumed that [a developmentally disabled] child, upon reaching majority, would choose sexual sterilization for him/herself." (*Shedding Myth-Conceptions, op. cit. supra,* at p. 635, fn. omitted.)

Still others have stressed the likelihood that the third party decisionmaker, the court and the incompetent person will have conflicting interests. "Judicial refusal to recognize substituted consent as a proper alternative to an incompetent's consent to sterilization is indicative of its inadequacies. A part of this reluctance may be due to a belief that a parent's interests in the sterilization may not be consistent with the incompetent's best interests. For example, a parent seeking sterilization for the incompetent may be motivated by such concerns as illegitimate mentally deficient offspring, and the care and financial support of such offspring. These concerns, although considerable, do not reflect the personal welfare and interests of the incompetent in improving her condition through sterilization. In addition, substituted judgment leaves great discretion in the judiciary and could lead to inconsistent application." (Note, *Addressing the Consent Issue Involved in the Ster-*

*ilization of Mentally Incompetent Females* (1979) 43 Albany L.Rev. 322, 328, fns. omitted.)

## IV.

Notwithstanding all of the foregoing problems, courts in other jurisdictions have concluded that incompetent, developmentally disabled persons have a constitutional right to be sterilized, a right which can be vindicated only by giving to others the power to make this awesome decision.

For the reasons stated earlier in this opinion, the procreative choice model and the substituted consent device are ill-suited to the situation confronting this court. As a result, the sister state decisions which rely on this approach fail to provide adequate protection for the incompetent, developmentally disabled person's fundamental right to procreate. (See *Hayes, supra,* 608 P.2d at pp. 640-641; *Grady, supra,* 426 A.2d at pp. 481-483; *In re Penny N.* (1980) 120 N.H. 269 [414 A.2d 541, 543]; *Matter of A. W., supra,* 637 P.2d at pp. 375-376; *Matter of C. D. M., supra,* 627 P.2d at pp. 612-613.)

The majority patch together a test which combines the standards and procedural requirements set forth in one of these decisions—*Hayes*—with those of section 2357. (See maj. opn., *ante,* at pp. 165-166, 168.)

Even the most cursory examination of section 2357 reveals that it is intended for application in entirely different circumstances and is ill-suited to the task. Section 2357 was designed for decisions regarding treatment of medical conditions posing a threat to the life or health of an incompetent conservatee. Judicial authorization of a conservator's request for medical treatment is permitted only where, "[i]f untreated, there is a probability that the condition will become life-endangering or result in a serious threat to the *physical* health of the . . . conservatee." (§ 2357, subd. (h)(2), italics added.) In Valerie's case, this prerequisite is nonexistent, since no one has even suggested that her capacity to procreate, assuming that she is in fact fertile, constitutes a threat to her physical health.

Section 2357 does require the conservator to show what, if any, efforts have been made to obtain an informed consent from the conservatee. (§ 2357, subd. (c)(6).) However, it does not require a finding that the conservatee's inability to make a decision about treatment is permanent. (See § 2357, subd. (h)(3).) This omission is probably due to the fact that the section is designed for use in medical emergencies presenting a moderate degree of time urgency, a situation in which such a requirement would be inappropriate. Similarly, section 2357 does not require a court to find that

a less drastic and irreversible alternative is unlikely to become available in the near future. In the sterilization context, that omission is shocking.

The *Hayes* standards remedy some of the more glaring deficiencies in section 2357. However, *Hayes* suffers from all the problems inherent in the application of the procreative choice model and the substituted consent device in this context. Moreover, it includes fitness for parenthood among its criteria. (*Hayes, supra,* 608 P.2d at p. 640; accord *Grady, supra,* 426 A.2d at p. 483.) There is merit in respondent's argument that this criterion is inconsistent with the notion that the choice being made is the one the conservatee would make. Considering fitness for parenthood is also inconsistent with the goal of putting an incompetent conservatee in the same position as normal individuals, who are free to bear or beget children without reference to their fitness as parents. Employing parental fitness as a criterion may also be constitutionally impermissible on overbreadth and underinclusiveness grounds. (See *Problem or Solution, op. cit. supra,* at pp. 928-932; Note, *Developments in the Law—The Constitution and the Family* (1980) 93 Harv. L.Rev. 1296, 1302-1313; *Right to Choose, op. cit. supra,* at p. 569, fn. 54.)

At least one of the other *Hayes* requirements conflicts with the theory of the majority opinion. The majority rest much of their constitutional analysis on Valerie's liberty interest in minimizing restrictions on her social interactions. Yet *Hayes* permits a trial court to authorize the sterilization of an incompetent, developmentally disabled woman only if it finds "by clear, cogent and convincing evidence" that "all less drastic contraceptive methods, *including supervision* . . . have been proved *unworkable* or *inapplicable.*" (*Hayes, supra,* 608 P.2d at p. 641, italics added.) The majority do not explain how this requirement, which they purport to adopt, can be squared with their theory that Valerie has a liberty interest in being sterilized in order to be free of parental supervision.

In sum, the majority compound the errors of their constitutional analysis with the adoption of an unsatisfactory patchwork of contradictory standards. I cannot subscribe to this careless exercise in judicial legislation, particularly where such a fundamental right is at stake.

## V.

Respondent has demonstrated a compelling state interest in protecting an incompetent, developmentally disabled conservatee's fundamental right to procreate. Contrary to the majority's effort to merge this right into a general right of procreative choice, the right to procreate has an independent foundation. For a permanently incompetent individual who is incapable of mak-

ing choices about sterilization, the right to procreate must be regarded as paramount to any "right to be sterilized." The latter right, as a component of the right of procreative choice, is meaningful only in the case of an individual capable of making such choices.

The adverse impact of a sterilization ban on a developmentally disabled conservatee's liberty is also insufficient to justify jeopardizing her right to procreate. Sterilization results in a complete and irrevocable deprivation of the right to procreate, while restrictions on an individual's activities resulting from a ban on sterilization constitute at most a partial deprivation of that individual's liberty.

The ban on sterilization of incompetent conservatees in section 2356, subdivision (d) is necessary to effectuate the state's compelling purpose of protecting the fundamental right to procreate. Manifestly, the legal fiction of substituted consent is inadequate to protect this fundamental right. Accordingly, I would hold that section 2356, subdivision (d) is constitutional.